**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JONATHAN NOBLE, an individual,
ARLENE NOBLE, an individual; GSS
INTERNATIONAL MNG LLC, a California
Limited Liability Company, SHMUEL GOSHEN,
an individual; SHULAMIT
GOSHEN, an individual; SAMUEL LI, an
individual; and LILLIAN HAN, an individual,

                Plaintiffs

v.                                          Case No.  6:10-CV-01331-JA-DAB

BRENT BALDASARE, WHITNEY HARP, J.W.
STEPHENS, and LEON SACCO, individually,

                Defendants.

## WHITNEY HARP'S AFFIDAVIT IN SUPPORT OF FULL OR PARTIAL SUMMARY JUDGMENT

STATE OF FLORIDA
COUNTY OF ORANGE

      BEFORE ME, the undersigned authority, on this day personally appeared, WHITNEY HARP, who, being duly sworn, deposes and says:

    1.    I am over the age of 21 years and of sound and competent mind.

    2.    I have personal knowledge of all matters about which testimony is given herein. I have such personal knowledge from my own personal observations.

    3.    I was connected with a Florida limited liability company registered to do business in the State of Georgia, namely, Blue Ridge George Capital Partners, LLC ("BRG"), the entity that sold real property to the Plaintiffs. My connection with BRG was through one of its managing member entities, Avia Management, LLC, another Florida limited liability company (hereinafter, "Avia Management"), in which I owned a 25% membership interest.

Avia Management owned about a 28% interest in BRG.

4. BRG's other owners included the wife of my co-Defendant, LEON SACCO, namely, Corina Sacco, who held about a 20% interest directly in BRG, a group of individual investors (9 or more), who held about a 22% interest in BRG, and Mountain Tracks Developing & Building, LLC, a Georgia limited liability company (hereinafter, "Mountain Tracks"), which held a 30% interest in BRG. I understood at all times that Mountain Tracks was wholly owned and run by J.W. STEPHENS.

5. At all times relevant hereto, Resort & Spa Investments, LLC, a Florida limited liability company, had as its members and managers, BRENT BALDASARE, Andrew Shumway, Paul Flesh, J.W. STEPHENS, LEON SACCO, and myself. I believe that we all owned equal interests of 20% each.

6. The entities described above were involved in the development of a mountain resort community known as Nature's Estates Resort & Spa at Paris Mountain, or simply as Nature's Estates, which was located near Blue Ridge, Georgia. BRG was the owner of the real property on which the development was located. Resort & Spa Investments, LLC was formed with the idea of its being the vehicle for developing, marketing, and selling a fractional shares program (similar to a timeshare program, in certain respects) using the subdivided lots at Nature's Estates that were to be improved with first class cabin homes and other amenities (equestrian stable, concierge services, restaurant, club house, and pool area, etc.) for that purpose.

7. In late 2008, Paul W. Flesh, who was running the development process in conjunction with J.W. STEPHENS and Andrew Shumway for BRG, proposed to the other investors in the project, including myself, that we needed to obtain an injection of additional

capital into the project to allow a paydown on the mortgage financing against the real property for the project and allowing for one of the entities involved in the project or a new one to obtain construction financing so that the fractional shares marketing and sales could begin. The sales of the fractional shares were intended to provide the ongoing cash flow that would be necessary to continue operations in the development and sales process.

8. Paul W. Flesh provided an analysis of the finances for the project showing that we minimally needed to sell 17 lots at around $150,000.00 per lot to be able to pursue the proposal he was making for an injection of capital. Paul W. Flesh referred to what we were doing as "land banking," because it would allow our group, once it had generated enough sales of the fractional share interests, to obtain control of the 17 lots again and to maintain control of the completion of the project.

9. I know that BRENT BALDASARE became involved in the process of searching for an investment group or entity that could make the necessary 17-lot purchase, and that he eventually connected with a group known as Full Circle Resort Properties, LLC (hereinafter, "Full Circle"). I understood that negotiations with Full Circle progressed very nicely to the point that, primarily through the efforts of Paul W. Flesh, a fractional shares sales specialist named Terry Weaver, and a representative of Full Circle named Charles "Chuck" Rutland (and to a much lesser extent, BRENT BALODASARE), extensive proposed documentation was prepared, including a Letter of Intent dated January 6, 2008 and related detailed documents.

10. Full Circle had insisted that as part of the lot "buyback" program, the individuals behind BRG, Mountain Tracks, and Avia Management would have to provide their individual guarantees for the "buyback" obligation of the entity that would be obligated to

make the purchase, except that instead of Corina Sacco, her husband and my co-Defendant, LEON SACCO, would need to sign the guarantee.

11. I understand that three identical duplicate originals of the partially executed guarantee form were given by Paul W. Flesh to BRENT BALDASARE, who brought them to me, but they had not been executed by all of the other proposed Guarantors. In particular, I recall for certain that J. W. STEPHENS and LEON SACCO's signatures were not present. I insisted that all other proposed Guarantors' signatures should be on the documents before I would sign them, and I returned the original partially executed forms to BRENT BALDASARE for him to get them to Paul W. Flesh so he could get the other necessary signatures of all the other proposed Guarantors.

12. I understand that Paul W. Flesh later provided BRENT BALDASARE with three duplicate originals of same apparently executed by all other Guarantors besides BRENT BALDASARE and me, so we proceeded to execute all three of the documents. The blank for the name(s) of the Obligee(s) was left incomplete, because we all understood that there was a possibility some other entity could be involved in the transaction besides Full Circle, which actually was acting as a conduit-entity for various other individuals and/or entities. In other words, it was quite possible that Full Circle would assign its rights in the deal, or that another entity would be chosen, subject to our approval. I understand that BRENT BALDASARE provided the three (3) duplicate original fully executed Personal Guaranty forms (but with no names inserted in the blanks for the names of the Obligee(s)) back to Paul W, Flesh for him to hold them for later use once the deal with Full Circle was finalized and was ready to be closed. I believe that the events described in this paragraph occurred in early 2008.

13. The guarantee document was signed in triplicate with the idea that one version

of the document would be given to the purchaser of the 17 lots, another would be given to the closing agent, and another would be given to BRG. Once we returned the fully executed guarantee agreements to Paul W. Flesh, that was the last we saw of them. We now have only seen copies produced by the Plaintiffs in this action of what appear to be the same documents. It must be emphasized that neither BRENT BALDASARE nor I would have executed the guarantee documents if we had known that they had not been completely executed by all other Guarantors, and especially if we had known that any of the signatures for the Guarantors had been forged. I have learned only since the beginning of this case that J. W. STEPHENS swears that his signature was forged by someone without his knowledge or permission on the Personal Guarantees on which the Plaintiffs rely in this action.

14. After BRENT BALDASARE and I had executed the guarantee documents, we learned from Paul W. Flesh that the deal with Full Circle had fallen through. By that time in the first half of 2008, the banking crisis had made financing for most real estate projects almost impossible, so the Nature's Estates project's progress slowed. Apparently, during this timeframe, even though he knew that the "buyback" program and the executed Personal Guarantees were not supposed to be used for anything other than for a 17-lot transaction with Full Circle or with some other entity or individual (s) who could complete a 17-lot purchase, Paul W. Flash apparently completed sales of only 4 lots by BRG to the Plaintiffs involving the "buyback" concept and the Personal Guarantees.

15. Those actions of Paul W. Flash never were approved by the managing members of BRG, namely, Mountain Tracks and Avia Management, and I certainly did not approve them or know about them. I remained busily involved in my real estate development work in the East Orlando area real estate development projects in which BRENT BALDASARE and I

were involved with some of the individuals from the Nature's Estates group, and those obligations probably contributed to my being less informed about activities involving the Nature's Estates project than I might otherwise have been.

16.  I know that BRENT BALDASARE and I had trusted Paul W. Flesh to act responsibly on behalf of BRG and Resort & Spa Investments, LLC, and particularly, to use the executed personal guarantee documents only for their specified purpose, a 17-lot sale by BRG so that it could obtain construction financing for the cabins to be used in making fractional sales at the Nature's Estates project. We unfortunately relied in large part on the idea that Paul W. Flesh certainly would act responsibly and within his authority on the project, because his father-in-law, LEON SACCO, had invested well over $1 million of his own money in the Nature's Estates project.  I never expected that Paul W. Flesh would use the guarantee documents for the sale of less than a handful of lots to anyone.

17.  Until early 2010, I had no personal knowledge that BRG had sold lots to the Plaintiffs in transactions that purportedly involved the use of related "Lot/Land Purchase and Sale Agreements" for an inadequately identified purchaser to, as the Plaintiffs have alleged in their First Amended Complaint, "buyback" the properties sold to them by BRG in 2008.  I never had seen any of the alleged "Buy Back Agreements" prior to the Plaintiff, JONATHAN NOBLE, sending BRENT BALDASARE the one that he claimed to have been provided as part of the transaction involving his wife, the Plaintiff, ARLENE NOBLE, and BRG.  BRENT BALDASARE had shared this information with me at the time.  I also had no personal knowledge that someone, presumably Paul W. Flesh, had used the three (3) executed Personal Guarantee documents in connection with those sales prior to BRENT BALDASARE's communicating with JONATHAN NOBLE in early 2010 and passing on information from

those communications to me.

18.  I note that although JONATHAN NOBLE has stated in my presence that BRENT BALDASARE's facsimile information appears on a copy of one of the documents he alleges to have been sent to him prior to the real estate closing between BRG, his wife, and him, this is no evidence of BRENT BALDASARE's knowing of the transaction or of any of the documentation relating for it, because I know that BRENT BALDASARE allowed some his business associates, including, but not limited to, myself, to use his Worldwide Web-based (online) "Free Facsimile" service to conduct business for the several entities involved in the Nature's Estates Project.  The said Web-based facsimile service automatically imprinted BRENT BALDASARE's information on documentation sent through it, according to my recollection.

19.  The alleged "Buyback Agreement" provided to BRENT by JONATHAN NOBLE in early 2010 is identical to the copy attached to Defendants, Baldasare and Harp's, First Requests for Admission as Exhibit "A," except that the version attached to the Requests for Admission bears "Bates" number information relating to the Plaintiffs' Rule 26 disclosures. This agreement allegedly is the underlying agreement for the Personal Guarantees involved in this action. In the "Buyback Agreement," the parties are not identified other than by references to "the undersigned buyer ('Buyer')" and "the undersigned seller ('Seller')" in combination with the manner in which the Buyer and Seller are identified on the signature page for the document. The Buyer is identified only with the signature of Paul W. Flesh on a line designated with the preprinted language, "Buyer's Signature," which has another line underneath it with the preprinted words, "Print or Type Name," beneath it. On that line is the following in hand-printed words: "by Paul W. Flesh, Managing Member." <u>No entity is</u>

<u>identified in connection with Paul W. Flesh's signature</u>. It plainly appears that someone applied signatures with the same names as the Plaintiffs, JONATHAN NOBLE and ARLENE NOBLE, above the line designated with the preprinted words, "Seller's Signature."

20. None of the guarantee agreements attached to the First Amended Complaint as exhibits were completed at the time they were signed by me such that they identified the Obligees, and I never gave my permission for any of the names of the Plaintiffs to be inserted in the guarantee agreements, as apparently was done in the case of the Plaintiffs, JONATHAN NOBLE, LILLIAN HAN, and SAMUEL LI. <u>I **never** dealt with the Plaintiffs in connection with the execution and delivery of the Personal Guarantees, and I **never** provided any communication to the Plaintiffs that the Plaintiffs could deal with anyone in my stead, as my agent, with respect to the delivery of the Personal Guarantees.</u> I never was involved in any way with the real estate sales transactions between BRG and the Plaintiffs, other than indirectly and passively as a member in Avia Management, a partial interest holder in BRG.

21. I <u>never</u> authorized Paul W. Flesh or anyone else to offer the subject Guarantees to the Plaintiffs, but had authorized the use of the Guarantees <u>only</u> in regard to a proposed transaction for the sale of at least 17 lots with a particular group of investors who were <u>not</u> the Plaintiffs, as stated above. Neither Paul Flesh nor anyone else had my authority to fill in the names of JONATHAN NOBLE, LILLIAN HAN, or SAMUEL LI as the Obligees on the subject Personal Guarantee forms. I <u>never</u> offered the Personal Guarantees to the Plaintiffs, and I <u>never</u> entered into the Personal Guarantees with the Plaintiffs.

22. In fact, I never had any communication at all with any of the Plaintiffs prior to learning from BRENT BALDASARE in early 2010 that JONTHAN NOBLE and his wife, ARLENE NOBLE, were alleging some sort of obligation that I allegedly owed to them under

an alleged personal guarantee agreement in connection with an agreement by some person or entity to repurchase, or "buy back," a lot that they allegedly had purchased in 2008 from BRG in the Nature's Estates Project. I subsequently learned of the similar situation involving the other Plaintiffs and have confirmed from public records that the purchases of lots by the Plaintiffs did occur. It should be noted that I do not have ready access to the records of BRG or of Resort and Spa Investments, LLC, because those records were under the control of Paul W. Flesh, who has not cooperated in communicating with me or others representing me, who has not maintained or produced such records, as far as I know, and who has not communicated with me since he filed for bankruptcy a couple of years ago.

23. I can only assume that the Plaintiffs, Paul Flesh, or some other person(s) filled in the blanks for the name of the Obligee(s) on the Personal Guarantees upon which JONATHAN NOBLE, ARLENE NOBLE, LILLIAN HAN, and SAMUEL LI are making their claims in this action. I believe that the said Plaintiffs knew or should have known that this was the case.

24. None of the Plaintiffs ever has provided me with written notice that the provisions of the Guarantees relative to the payment of attorneys' fees, in addition to the principal and interest allegedly owed, would be enforced, and that I had 10 days from the receipt of such notice to pay the principal and interest without the attorneys' fees.

25. Had I been provided notice of acceptance of the alleged Guarantees by any of the Plaintiffs prior to the Plaintiffs' closing on their lot purchases, I would have informed the Plaintiffs that the alleged Guarantees were not meant to apply to the Plaintiffs, and that the Plaintiffs could not rely in any way upon the Guarantees for closing on the lot purchases that they made with BRG.

FURTHER AFFIANT SAYETH NOT.

_/s/ Whitney Harp_
WHITNEY HARP

The foregoing affidavit was acknowledged before me this 3RD day of December, 2012 by WHITNEY HARP. He is personally known to me or has produced N/A as identification and did take an oath.

_/s/ Susan M. Miller_
NOTARY PUBLIC
Susan M. Miller
[Print name of notary]

SUSAN M. MILLER
MY COMMISSION # EE139708
EXPIRES November 16, 2015
FloridaNotaryService.com
(407) 398-0153

My Commission Expires:

### CERTIFICATE OF SERVICE

I certify that on December 3, 2012, I electronically filed the foregoing with the Clerk of the Court by using the *CM/ECF* system for the Service List below and by US Mail to JW STEPHENS, Pro Se, P.O. Box 714, Mineral Bluff, Georgia 30559.

TERRY & FRAZIER, P.A.

BY: s/ T. Scott Frazier
T. SCOTT FRAZIER, ESQUIRE
Florida Bar No.: 311601
Terry and Frazier, P.A.
125 East Jefferson Street
Orlando, Florida 32801
Tele: (407) 843-1956
Fax: (407) 843-4210
Email: terryandfrazier@bellsouth.net
Attorney for Defendants Baldasare and Harp

### SERVICE LIST

BRADFORD A. PATRICK, ESQUIRE
3001 North Rocky Point Drive East
Suite 200
Tampa, FL 33607
E-mail: bap@baplegal.com

Attorney for Plaintiffs

JENNIFER A. ENGLERT, ESQUIRE
Englert, Leite & Martin, PL
3564 Avalon Park Blvd E. Ste. 1 # 266
Orlando, Florida 32828
E-mail: jenglert@elmattorneys.com
Attorney for Defendant Leon Sacco

C:\Users\Susan\Documents\SUSAN\Clients\Baldasare-Harp\Harp Affidavit.doc