## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JONATHAN NOBLE, an individual,
ARLENE NOBLE, an individual; GSS
INTERNATIONAL MNG LLC, a California
Limited Liability Company, SHMUEL GOSHEN,
an individual; SHULAMIT
GOSHEN, an individual; SAMUEL LI, an
individual; and LILLIAN HAN, an individual,

Plaintiffs

v.                                          Case No.  6:10-CV-01331-JA-DAB

BRENT BALDASARE, WHITNEY HARP, J.W.
STEPHENS, and LEON SACCO, individually,

Defendants.

---

### BRENT BALDASARE'S AFFIDAVIT IN SUPPORT OF FULL OR PARTIAL SUMMARY JUDGMENT

STATE OF FLORIDA
COUNTY OF ORANGE

BEFORE ME, the undersigned authority, on this day personally appeared, BRENT BALDASARE, who, being duly sworn, deposes and says:

1.     I am over the age of 21 years and of sound and competent mind.

2.     I have personal knowledge of all matters about which testimony is given herein. I have such personal knowledge from my own personal observations.

3.     I was connected with a Florida limited liability company registered to do business in the State of Georgia, namely, Blue Ridge George Capital Partners, LLC ("BRG"), the entity that sold real property to the Plaintiffs.  My connection with BRG was through one of its managing member entities, Avia Management, LLC, another Florida limited liability company (hereinafter,

–1–

"Avia Management"), in which I owned a 25% membership interest. Avia Management owned about a 28% interest in BRG.

4.     BRG's other owners included the wife of my co-Defendant, LEON SACCO, namely, Corina Sacco, who held about a 20% interest directly in BRG, a group of individual investors (9 or more), who held about a 22% interest in BRG, and Mountain Tracks Developing & Building, LLC, a Georgia limited liability company (hereinafter, "Mountain Tracks"), which held a 30% interest in BRG. I understood at all times that Mountain Tracks was wholly owned and run by J.W. STEPHENS.

5.     At all times relevant hereto, Resort & Spa Investments, LLC, a Florida limited liability company, had as its members and managers, WHITNEY HARP, Andrew Shumway, Paul Flesh, J.W. STEPHENS, LEON SACCO, and myself. I believe that we all owned equal interests of 20% each.

6.     The entities described above were involved in the development of a mountain resort community known as Nature's Estates Resort & Spa at Paris Mountain, or simply as Nature's Estates, which was located near Blue Ridge, Georgia. BRG was the owner of the real property on which the development was located. Resort & Spa Investments, LLC was formed with the idea of its being the vehicle for developing, marketing, and selling a fractional shares program (similar to a timeshare program, in certain respects) using the subdivided lots at Nature's Estates that were to be improved with first class cabin homes and other amenities (equestrian stable, concierge services, restaurant, club house, and pool area, etc.) for that purpose.

7.     In late 2008, Paul W. Flesh, who was running the development process in conjunction with J.W. STEPHENS and Andrew Shumway for BRG, proposed to the other investors in the project, including myself, that we needed to obtain an injection of additional

capital into the project to allow a paydown on the mortgage financing against the real property for the project and allowing for one of the entities involved in the project or a new one to obtain construction financing so that the fractional shares marketing and sales could begin. The sales of the fractional shares were intended to provide the ongoing cash flow that would be necessary to continue operations in the development and sales process.

8.     Paul W. Flesh provided an analysis of the finances for the project showing that we minimally needed to sell 17 lots at around $150,000.00 per lot to be able to pursue the proposal he was making for an injection of capital. Paul W. Flesh referred to what we were doing as "land banking," because it would allow our group, once it had generated enough sales of the fractional share interests, to obtain control of the 17 lots again and to maintain control of the completion of the project.

9.     I became involved in the process of searching for an investment group or entity that could make the necessary 17-lot purchase, and I eventually connected with a group known as Full Circle Resort Properties, LLC (hereinafter, "Full Circle"). Negotiations with Full Circle progressed very nicely to the point that, primarily through the efforts of Paul W. Flesh, a fractional shares sales specialist named Terry Weaver, and a representative of Full Circle named Charles "Chuck" Rutland (and to a much lesser extent, myself), extensive documentation was prepared, including a Letter of Intent dated January 6, 2008 and related detailed documents. A copy of the Letter of Intent and the related documents that I happened to still have on my computer when this action was filed are attached hereto as Exhibit "A."

10.     Full Circle had insisted that as part of the lot "buyback" program, the individuals behind BRG, Mountain Tracks, and Avia Management would have to provide their individual guarantees for the "buyback" obligation of the entity that would be obligated to make the purchase,

except that instead of Corina Sacco, her husband and my co-Defendant, LEON SACCO, would need to sign the guarantee. Therefore, a Personal Guarantee form similar or identical to the form upon which the Plaintiffs in this action rely was drafted by Full Circle's attorney, according to my recollection.

11.     Three identical duplicate originals of the partially executed guarantee form were given by Paul W. Flesh to me, but they had not been executed by all of the other proposed Guarantors. In particular, I recall for certain that J. W. STEPHENS and LEON SACCO's signatures were not present. WHITNEY HARP insisted that all other proposed Guarantors' signatures should be on the documents before he would sign them, and I followed his lead in this regard. I returned the original partially executed forms to Paul W. Flesh with the advice that WHITNEY HARP and I would not sign the forms until he provided them to us with all of the other proposed Guarantors' signatures.

12.     Paul W. Flesh later provided me with three duplicate originals of same apparently executed by all other Guarantors besides WHITNEY HARP and me, so we proceeded to execute all three of the documents. The blank for the name(s) of the Obligee(s) was left incomplete, because we all understood that there was a possibility some other entity could be involved in the transaction besides Full Circle, which actually was acting as a conduit-entity for various other individuals and/or entities. In other words, it was quite possible that Full Circle would assign its rights in the deal, or that another entity would be chosen, subject to our approval. I provided the three (3) duplicate original fully executed Personal Guaranty forms (but with no names inserted in the blanks for the names of the Obligee(s)) back to Paul W, Flesh for him to hold them for later use once the deal with Full Circle was finalized and was ready to be closed. I believe that the events described in this paragraph occurred in early 2008.

13.     The guarantee document was signed in triplicate with the idea that one version of the document would be given to the purchaser of the 17 lots, another would be given to the closing agent, and another would be given to BRG. Once we returned the fully executed guarantee agreements to Paul W. Flesh, that was the last we saw of them. We now have only seen copies produced by the Plaintiffs in this action of what appear to be the same documents. It must be emphasized that neither WHITNEY HARP nor I would have executed the guarantee documents if we had known that they had not been completely executed by all other Guarantors, and especially if we had known that any of the signatures for the Guarantors had been forged. I have learned only since the beginning of this case that J. W. STEPHENS swears that his signature was forged by someone without his knowledge or permission on the Personal Guarantees on which the Plaintiffs rely in this action.

14.     After WHITNEY HARP and I had executed the guarantee documents, we learned from Paul W. Flesh that the deal with Full Circle had fallen through. By that time in the first half of 2008, the banking crisis had made financing for most real estate projects almost impossible, so the Nature's Estates project's progress slowed. Apparently, during this timeframe, even though he knew that the "buyback" program and the executed Personal Guarantees were not supposed to be used for anything other than for a 17-lot transaction with Full Circle or with some other entity or individual (s) who could complete a 17-lot purchase, Paul W. Flash apparently completed sales of only 4 lots by BRG to the Plaintiffs involving the "buyback" concept and the Personal Guarantees.

15.     Those actions of Paul W. Flash never were approved by the managing members of BRG, namely, Mountain Tracks and Avia Management, and I certainly did not approve them or know about them. I remained busily involved in my chiropractic practice in the East Orlando area while also doing what I could to work with WHITNEY HARP on local real estate development

projects in which we were involved with some of the individuals from the Nature's Estates group, and those obligations probably contributed to my being less informed about activities involving the Nature's Estates project than I might otherwise have been.

16. I know that WHITNEY HARP and I had trusted Paul W. Flesh to act responsibly on behalf of BRG and Resort & Spa Investments, LLC, and particularly, to use the executed personal guarantee documents only for their specified purpose, a 17-lot sale by BRG so that it could obtain construction financing for the cabins to be used in making fractional sales at the Nature's Estates project. We unfortunately relied in large part on the idea that Paul W. Flesh certainly would act responsibly and within his authority on the project, because his father-in-law, LEON SACCO, had invested well over $1 million of his own money in the Nature's Estates project. I never expected that Paul W. Flesh would use the guarantee documents for the sale of less than a handful of lots to anyone.

17. Until early 2010, I had no personal knowledge that BRG had sold lots to the Plaintiffs in transactions that purportedly involved the use of related "Lot/Land Purchase and Sale Agreements" for an inadequately identified purchaser to, as the Plaintiffs have alleged in their First Amended Complaint, "buyback" the properties sold to them by BRG in 2008. I never had seen any of the alleged "Buy Back Agreements" prior to the Plaintiff, JONATHAN NOBLE, sending me the one that he claimed to have been provided as part of the transaction involving his wife, the Plaintiff, ARLENE NOBLE, and BRG. I also had no personal knowledge that someone, presumably Paul W. Flesh, had used the three (3) executed Personal Guarantee documents in connection with those sales prior to my communicating with JONATHAN NOBLE in early 2010. Once I learned these pieces of information, I shared them with WHITNEY HARP.

18. I note that although JONATHAN NOBLE has stated in my presence that my

facsimile information appears on a copy of one of the documents he alleges to have been sent to him prior to the real estate closing between BRG, his wife, and him, this is no evidence of my knowing of the transaction or of any of the documentation relating for it, because I allowed some of my business associates, including, but not limited to, Paul W. Flesh, to use my Worldwide Web-based (online) "Free Facsimile" service to conduct business for the several entities involved in the Nature's Estates Project. Because I had no knowledge of the transaction between BRG and the NOBLES or any of the documentation used in it until nearly two years after it closed, I can only assume that Paul W. Flesh or someone else involved in the transaction sent some of the documentation related to the transaction to JONATHAN NOBLE using my said Web-based facsimile service, which then automatically imprinted my information on such documentation.

19.     The alleged "Buyback Agreement" provided to me by JONATHAN NOBLE in early 2010 is identical to the copy attached to Defendants, Baldasare and Harp's, First Requests for Admission as Exhibit "A," except that the version attached to the Requests for Admission bears "Bates" number information relating to the Plaintiffs' Rule 26 disclosures. This agreement allegedly is the underlying agreement for the Personal Guarantees involved in this action. In the "Buyback Agreement," the parties are not identified other than by references to "the undersigned buyer ('Buyer')" and "the undersigned seller ('Seller')" in combination with the manner in which the Buyer and Seller are identified on the signature page for the document. The Buyer is identified only with the signature of Paul W. Flesh on a line designated with the preprinted language, "Buyer's Signature," which has another line underneath it with the preprinted words, "Print or Type Name," beneath it. On that line is the following in hand-printed words: "by Paul W. Flesh, Managing Member." No entity is identified in connection with Paul W. Flesh's signature. It plainly appears that someone applied signatures with the same names as the Plaintiffs,

JONATHAN NOBLE and ARLENE NOBLE, above the line designated with the preprinted words, "Seller's Signature."

20.     None of the guarantee agreements attached to the First Amended Complaint as exhibits were completed at the time they were signed by me such that they identified the Obligees, and I never gave my permission for any of the names of the Plaintiffs to be inserted in the guarantee agreements, as apparently was done in the case of the Plaintiffs, JONATHAN NOBLE, LILLIAN HAN, and SAMUEL LI. <u>I **never** dealt with the Plaintiffs in connection with the execution and delivery of the Personal Guarantees, and I **never** provided any communication to the Plaintiffs that the Plaintiffs could deal with anyone in my stead, as my agent, with respect to the delivery of the Personal Guarantees.</u> I never was involved in any way with the real estate sales transactions between BRG and the Plaintiffs, other than indirectly and passively as a member in Avia Management, a partial interest holder in BRG.

21.     I <u>never</u> authorized Paul W. Flesh or anyone else to offer the subject Guarantees to the Plaintiffs, but had authorized the use of the Guarantees <u>only</u> in regard to a proposed transaction for the sale of at least 17 lots with a particular group of investors who were <u>not</u> the Plaintiffs, as stated above.   Neither Paul Flesh nor anyone else had my authority to fill in the names of JONATHAN NOBLE, LILLIAN HAN, or SAMUEL LI as the Obligees on the subject Personal Guarantee forms. I <u>never</u> offered the Personal Guarantees to the Plaintiffs, and I <u>never</u> entered into the Personal Guarantees with the Plaintiffs.

22.     In fact, I never had any communication at all with any of the Plaintiffs prior to learning in early 2010 that JONTHAN NOBLE and his wife, ARLENE NOBLE, were alleging some sort of obligation that I allegedly owed to them under an alleged personal guarantee agreement in connection with an agreement by some person or entity to repurchase, or "buy back,"

a lot that they allegedly had purchased in 2008 from BRG in the Nature's Estates Project.  I subsequently learned of the similar situation involving the other Plaintiffs and have confirmed from public records that the purchases of lots by the Plaintiffs did occur.  It should be noted that I do not have ready access to the records of BRG or of Resort and Spa Investments, LLC, because those records were under the control of Paul W. Flesh, who has not cooperated in communicating with me or others representing me, who has not maintained or produced such records, as far as I know, and who has not communicated with me since he filed for bankruptcy a couple of years ago.

23.     I can only assume that the Plaintiffs, Paul Flesh, or some other person(s) filled in the blanks for the name of the Obligee(s) on the Personal Guarantees upon which JONATHAN NOBLE, ARLENE NOBLE, LILLIAN HAN, and SAMUEL LI are making their claims in this action.  I believe that the said Plaintiffs knew or should have known that this was the case.

24.     None of the Plaintiffs ever has provided me with written notice that the provisions of the Guarantees relative to the payment of attorneys' fees, in addition to the principal and interest allegedly owed, would be enforced, and that I had 10 days from the receipt of such notice to pay the principal and interest without the attorneys' fees.

25.     Had I been provided notice of acceptance of the alleged Guarantees by any of the Plaintiffs prior to the Plaintiffs' closing on their lot purchases, I would have informed the Plaintiffs that the alleged Guarantees were not meant to apply to the Plaintiffs, and that the Plaintiffs could not rely in any way upon the Guarantees for closing on the lot purchases that they made with BRG.  FURTHER AFFIANT SAYETH NOT.

BRENT BALDASARE

The  foregoing  affidavit  was  acknowledged  before  me  this ___3___ day of

December_____, 2012 by BRENT BALDASARE. He is personally known to me or has
produced _____Drivers license_____ as identification and did take an oath.

NOTARY PUBLIC
Devon Sobers
[Print name of notary]

DEVON SOBERS
Notary Public - State of Florida
My Comm. Expires Jul 11, 2015
Commission # EE 111439

My Commission Expires:

## CERTIFICATE OF SERVICE

I certify that on **December 3**, 2012, I electronically filed the foregoing with the
Clerk of the Court by using the *CM/ECF* system for the Service List below and by US Mail to
JW STEPHENS, Pro Se, P.O. Box 714, Mineral Bluff, Georgia 30559.

TERRY & FRAZIER, P.A.

BY:_____ s/ T. Scott Frazier_____
T. SCOTT FRAZIER, ESQUIRE
Florida Bar No.: 311601
Terry and Frazier, P.A.
125 East Jefferson Street
Orlando, Florida 32801
Tele: (407) 843-1956
Fax: (407) 843-4210
Email: terryandfrazier@bellsouth.net
Attorney for Defendants Baldasare and Harp

## SERVICE LIST

BRADFORD A. PATRICK, ESQUIRE
3001 North Rocky Point Drive East
Suite 200
Tampa, FL 33607
E-mail: bap@baplegal.com
Attorney for Plaintiffs

JENNIFER A. ENGLERT, ESQUIRE
Englert, Leite & Martin, PL
3564 Avalon Park Blvd E. Ste. 1 # 266

Orlando, Florida 32828
E-mail: jenglert@elmattorneys.com
Attorney for Defendant Leon Sacco

C:\Users\Susan\Documents\SUSAN\Clients\Baldasaro-Harp\Baldasare Affidavit.doc

Exhibit "A"

Exhibit "A"

Exhibit "A"

January, 6 2008

# Nature's Estates Resort & Spa Fractional Resort
# Full Circle Resort Properties, LLC
# 17 Lot Wholesale Lot Purchase
# Letter of Intent (LOI)

## PROJECT:

Full Circle Resort Properties (FCRP) and Natures Estates Resort & Spa (NERS) agree to a wholesale lot purchase and fractional development agreement. This can be achieved in a two tiered approach.

1. The first being the land purchase at a wholesale price.
2. The second tier is a partnership in the fractional resort development.

( Due to the extensive legal requirements of any fractional or timeshare resort, plus all of the policy, procedural, marketing, accounting, and third party vendors it is possible a development agreement is not reached. In this case a profitable buyback agreement or percentage of fractional sales profit can be contracted for FCRP. Whichever FCRP chooses best fits the needs of the investment.)

## Development Agreements for Phase I:

**FCRP agrees to**

- Develop resort homes to the specs of NERS Architect Review Committee (ARC). FCRP can choose to be on this committee. FCRP may choose and negotiate with the builder an acceptable fee for the construction costs of the Legacy Resort Home. Other third party requirements include Guest Services and Interval International.
- Market and sell the specific units via their network using their procedures, staff and systems.
- Furnish and decorate the fractional resort homes consistent with NERS ARC. Interval Exchange and Guest Services have certain standards for inclusion in the preferred hotel & resorts program.
- Possibly utilize Avia Management for contractor management and architecture services as a development partner or department head. Fees or percentage to be mutually agreed upon.
- Share marketing and creative branding and coordinate with NERS.

**NERS agrees to**
- Work with FCRP as a partner in the fractional development and sales of the property.
- Continue marketing campaigns via billboards, brokers, presentations, events & getaway prizes.
- Update, develop and build a fractional resort customized web based marketing engine via Cendyn. It will feature high resolution photos, fractional resort information, local attractions and demographic based e-postcards and broker newsletters. This is an automated system and is fully integrated for communications with brokers, buyers and investors. It will also have advance features such as e-concierge services, and e-proposal for buyers. The user database can be filtered and submarket groups can be created, the system also allows for lifetime broker registration of clients.
- Share marketing and creative branding with FCRP.
- Maintain the highest level of standards in all areas of the resort.

**Additional policies that need agreement for a successful development partnership**
- NERS is the only entity registered to sell fractional units. A mutually agreeable contract needs to be in place to assign closing contracts to this entity. A violation of this procedure could result in federal and state violations.
- All contracts should be generated out of one central program for inventory. This applies to sales and rental inventory. The proprietary software is designed to track inventory, available units, sold units, pending contracts, rental vacancies and check in and checkout procedures. It is also used to track individual use plans. This system is extremely efficient for a well trained staff to have real time information.
- FCRP guest that require property tours and personal presentation should go through NERS trained staff. Fractional Salesmanship is a specialty. The product is more than just real estate, even if it's for an investor. It's a lifestyle! The detailed questions need direct answers and a trained sales rep that represents the best interest of the property and the owners is essential. Every successful fractional resort, including all of Marriott's, requires a department head of sales.
  The model that has a proven track record is that all agents and brokers funnel buyers via dinners or referrals to the property and the highly specialized sales team of fractional consultants handles any questions and in a no pressure sales technique takes the buyer through the resort experience and eventually through the purchasing process, or continues the relationship as a resort consultant for as long as the prospect has interest. There is a specific course of action for this type of communication with a potential buyer, and it goes far beyond that of a real estate agent. When a contract is closed the relationship does not end there it continues after the sale with incredible customer service and total attention to detail of the buyer. The buyer's satisfaction is extremely important in the fractional resort purchase. Serving these people is the reason the resort is there,

they are the primary asset to every staff member on the property and in order to maintain this level of intense commitment to our resort guests, a full time director needs to be in place. Without a leader in this position the constant attention to detail will have no accountability. All departments need a leader.
- Will FCRP rental inventory be available for NERS marketing for a rental fee?
- The property should have the feel as a single development. A critical component to a successful resort is the management team. We should have a solid business model in place with professionals who can perform at a four star level. Our roles as partners and developers will be to have performance tools in place to manage our team and objectively assess their performance. Once the systems and people are in place on the property the sales departments can drive traffic without any reservations to the quality of the service and product their client receives.

## Fractional Sales Agreement:
- FCRP agrees to sell the units as fractional resort homes in accordance with the use plans of the NERS ARC fractional development plan. This phase includes the Heritage Package Resort Home in 1/12th units. It may also include the Legacy Package Resort Home in 1/6th units.
- FCRP sales of the fractional unit will be at least $150K per unit for preconstruction pricing, price increases will be at FCRP discretion and coordinated with NERS. This equals 204 total units equaling $30,600,000. A five thousand dollar assessment fee per fractional may be added for the completion of the resort clubhouse amenities.

## Rental Agreement:
- FCRP will enjoy the benefit of profits generated through short term rentals.
- Guest Services has been contracted to manage the resort, amenities and rental programs. A centralized computer system will be in place and Guest Services should be consulted on the best accounting and software configurations to have an accounting system to track and deposit income. They have been contracted to manage for a fee of $7,500 per month plus staff payroll costs and 4% of rental income. This is an excellent fee for the service provided. They are also responsible for calculating the HOA resort fees. Roughly estimated at $2,500 per unit per year.

## Due Diligence Period for 1st tier wholesale purchase agreement:
- Due Diligence Period within 30 days of LOI.
- Closing period within 30 days of completion of the Due Diligence Period.

## **Wholesale Pricing Structure**

$149,000 x 17 lots = $2,533,000 Purchase Price

Plus any broker commissions and closing costs.

The terms to this agreement are agreeable.  Please fax to 888-773-4154.

X
_____
Charles Chuck Rutland
Owner

X
_____
Dr. Brent Baldasare
Member

*Nature's Estates Resort and Spa*
AT PARIS MOUNTAIN

**DRAFT**
**11/02/2007**

## CONTRACT FOR LOT PURCHASE AND OPTION TO REPURCHASE FOR PHASE 1 OF NATURE'S ESTATES SUBDIVISION

**THIS CONTRACT FOR LOT PURCHASE AND OPTION TO REPURCHASE** ("Contract") is made and entered this ____ day of _____, 20___ by and between **BLUE RIDGE GEORGIA CAPITAL PARTNERS, LLC**, a Florida limited liability company ("Seller") qualified to do business in the state of Georgia and having an address of 2266 Three Rivers Drive, Orlando, Florida 32828 and _____ ("Buyer"), whose address and other identification information is as follows:

Home Address: _____   City: _____
County: _____   State: _____   Zip Code: _____
Home Telephone: (___) _____   Work: (___) _____   Telecopier: (___) _____
Social Security Number(s): _____

      1.     **PURCHASE AND SALE.** Buyer agrees to buy and Seller agrees to sell to Buyer, on the terms and conditions set forth in this Contract, a certain lot ("Lot") located in the 8th District and 1st Section of Fannin County, Georgia, more particularly described as follows: Lot # _____, as shown on the plat for Phase 1 of Nature's Estates Subdivision, dated November 9, 2006, prepared by Lane S. Bishop, F.R.L.S. No. 1575, and recorded in Plat Hanger ____, Page(s) _____, in the office of the Clerk of the Superior Court, Fannin County, Georgia ("Plat"), as such term is described in the Declaration of Covenants, Conditions, Restrictions and Easements for Nature's Estates Subdivision (as the same may be amended from time to time, the "Declaration"). Buyer acknowledges that Buyer has been provided a copy of the Declaration for review prior to execution of this Contract and that the Declaration will be recorded with the office of the Clerk of Superior Court, Fannin County, Georgia, prior to Closing.

      2.     **CONVEYANCE.** In accordance with the terms and conditions of this Contract, Seller agrees to convey to Buyer good and marketable title to the Lot.

      3.     **PURCHASE PRICE.** The purchase price for the Lot is _____ Dollars ($_____) ("Purchase Price"). Buyer shall pay the Purchase Price to Seller as follows:

      a.  Initial Earnest Money Deposit. Concurrently with execution of this Contract, Buyer has delivered a deposit in the amount of _____ Dollars ($_____.00) (this deposit, together with any additional deposits hereafter made by the Buyer, are hereafter collectively called the "**Deposit**") to _____ ("**Escrow Agent**"), to be deposited and held in a non-interest-bearing escrow/trust account within five (5) days of the full execution and delivery of this Contract, and disbursed to Seller at Closing (as hereinafter defined) or as otherwise provided in this Contract. If Buyer writes a check for earnest money and the same is deposited into Escrow Agent's escrow/trust account, Escrow Agent shall not be required to return the earnest money until the check has cleared the account on which the check was written. In the event any earnest money check is dishonored, for any reason, by the bank upon which it is drawn, Escrow Agent shall promptly give notice to Buyer and Seller. Buyer shall have three banking days after notice to deliver good funds to Escrow Agent. In the event Buyer does not timely deliver good funds, Seller shall have the right to terminate this Contract upon written notice to Buyer.

      (i)    Subject to the Disbursement of Earnest Money Deposit paragraph below:

      (1) Buyer shall be entitled to the earnest money upon: (a) a failure of the parties to enter into a binding agreement; (b) failure of any contingency or condition to which this Contract is subject; (c) termination of this Contract due to the default of Seller; (d) the termination of this Contract in accordance with a specific right to terminate set forth in the Contract; or (e) upon Closing.

      (2) Seller shall be entitled to the Deposit if this Contract is terminated due to the default of Buyer. In such event, Escrow Agent may pay the Deposit to Seller by check, which if accepted and deposited by Seller, shall constitute liquidated damages in full settlement of all claims of Seller. It is agreed to by the parties that such liquidated damages are not a penalty and are a good faith estimate of seller's actual damages, which damages are difficult to ascertain.

**DRAFT**
**11/02/2007**

        (ii)    <u>Disbursement of Earnest Money Deposit.</u>  Escrow Agent shall disburse the Deposit upon: (a) Closing; (b) a subsequent written Contract of Buyer and Seller; (c) an order to a court or arbitrator having jurisdiction over any dispute involving the earnest money; or (d) the failure of the parties to enter into a binding Contract (where there is no dispute over the formation or enforceability of the Contract).  In addition, Escrow Agent may disburse the earnest money upon a reasonable interpretation of the Contract, provided that Escrow Agent first gives all parties 15 days notice stating to whom and why the disbursement will be made.  Any party may object to the proposed disbursement by giving written notice of the same to Escrow Agent within the 15 day notice period.  Objections not timely made in writing shall be deemed waived.  If Escrow Agent receives an objection and, after considering it, decides to disburse the earnest money as originally proposed, Escrow Agent may do so and send notice to the parties of Escrow Agent's action.  If Escrow Agent decides to modify its proposed disbursement, Escrow Agent shall first send a new 15 day notice to the parties stating the rationale for the modification and to whom the disbursement will now be made.

        (iii)    <u>Interpleader.</u>  If there is a dispute over the Deposit which the parties cannot resolve after a reasonable period of time, and where Escrow Agent has a bona fide question as to who is entitled to the Deposit, Escrow Agent may interplead the Deposit into a court of competent jurisdiction.  Escrow Agent shall be reimbursed for and may deduct from any funds interpleaded, its costs and expenses, including reasonable attorney's fees actually incurred.  The prevailing defendant in the Interpleader lawsuits shall be entitled to collect is attorney's fees and the amount deducted by Escrow Agent from the non-prevailing defendant.

        (iv)    <u>Hold Harmless.</u>  All parties hereby agree to indemnify and hold Escrow Agent harmless from and against all claims, causes of action, suits and damages arising out of or related to the performance by Escrow Agent of its duties under this Contract.  All parties further covenant and agree not to sue Escrow Agent for damages relating to any decision of Escrow Agent to disburse Deposit made in accordance with the requirements of this Contract.

        b.    <u>Balance at Closing.</u>  Buyer shall pay the balance of the Purchase Price in the amount of _____ Dollars ($_____) to Seller at Closing either by cashier's check or by immediately available wire transfer of funds.  All payments must be made in U.S. funds, and all cashier's checks must be drawn on a bank located in the state of Georgia.

        4.    <u>FINANCING.</u>  Buyer shall be responsible for obtaining any financing necessary for Buyer's purchase of the Lot.  Seller has no responsibility for obtaining any such financing for the Buyer, and has not represented or warranted that any such financing is or will be available to Buyer.  Buyer's obligations under this Contract are contingent upon Buyer's obtaining financing, as further set forth in <u>Addendum "A"</u> of this Contract.

        5.    <u>TITLE EVIDENCE.</u>  On or before the date of Closing provided for in Section 6 below, Seller, at its expense, shall obtain and deliver to Buyer an ALTA Form B Commitment for Title Insurance ("**Commitment**") issued by a title insurance company licensed in Georgia ("**Title Company**") agreeing to issue to Buyer, upon recording of the Special Warranty Deed from Seller to Buyer, an owner's policy of title insurance (ALTA Form B) ( "**Title Policy**") with a coverage amount equal to the Purchase Price.  At Closing, the premium for the Title Policy shall be paid by Buyer.  The Title Policy shall insure Buyer's title to the Lot, subject to the following permitted exceptions ("**Permitted Exceptions**"), which Buyer agrees to accept:

        a.    All taxes affecting the Lot for the period commencing on the day of the Closing (as defined below) and continuing thereafter.

        b.    All laws and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded with the office of the Clerk of Superior Court of Fannin County, Georgia, which affect the Lot, for example, zoning restrictions, property use limitations and obligations, easements, rights of way, plat restrictions, agreements relating to telephone lines, gas lines, water and sewer lines, cable television lines and other utilities.

        c.    The restrictions, covenants, conditions, easements, and other matters described in Section 13 below in connection with Nature's Estates Property Owners' Association., a Florida corporation not for profit ("**Association**"), and the Declaration, and any other documents which, in the sole discretion of the Seller, are

2

**DRAFT**
**11/02/2007**

deemed necessary and appropriate for the Development (as defined in Section 11 below) and which now, or at any time after the Effective Date, are recorded with the office of the Clerk of Superior Court of Fannin County, and all amendments to any of such documents.

        d.      Buyer's mortgage and other recorded loan documents relating thereto, if any.

        e.      All standard printed exceptions contained in an ALTA Buyer's title insurance policy customarily issued in Fannin County, Georgia.

        f.      Any survey of Property attached to this Contract prior to the Effective Date shall be part of this Contract. Buyer shall have the right to terminate this Contract upon written notice to Seller if a new survey performed by a surveyor licensed in Georgia is obtained which is materially different from any attached survey with respect to the Lot, in which case Buyers earnest money shall be returned. The term "materially different" shall not apply to any improvements constructed by Seller in their agreed-upon locations subsequent to the Effective Date of this Contract. Matters revealed in said survey shall not relieve the warranty of title obligations of Seller referenced above.

If the Commitment shows that Buyer's title is subject to matters other than the Permitted Exceptions, Buyer shall, within five (5) days of receiving the Commitment, notify Seller in writing specifying the details of such matters ("Title Defects"). If any of the Title Defects renders title unmarketable, Seller shall have one hundred twenty (120) days from receipt of Buyer's notice within which to cure or remove any such Title Defects. If Seller does not cure or remove such Title Defects, Buyer shall have the option of either (i) accepting title, subject to such Title Defects, or (ii) terminating this Contract and receiving a refund of the Deposit, which shall immediately be returned to Buyer, whereupon Buyer and Seller shall be deemed to have released one another of all obligations under this Contract. Seller shall not be obligated to institute suit nor expend any sums to cure any Title Defects. If the Commitment shows that title is subject only to the Permitted Exceptions, then title to the Lot shall be deemed marketable and acceptable to Buyer.

        6.      CLOSING. At the time the Seller conveys the Lot to the Buyer, the Buyer shall simultaneously pay the Purchase Price to Seller. This transaction ("Closing") shall be closed on or before _____ ("Closing Date"), by the law firm of _____ at _____, at a time designated by Seller, or at such other time and place as designated by Seller, unless postponed or rescheduled pursuant to the terms of this Contract. If the law firm named above is not on the mortgage lender's approved list, and cannot be added in time to close this transaction, Buyer may select another law firm from lender's approved list to close this transaction. Seller is authorized to postpone or reschedule the Closing for any reason, and Buyer shall close on the new date, at the time and place Seller specifies in its "Notice of Postponement" as long as the Buyer has at least three (3) days' notice of the new date, time and place; provided, however, that such postponements by Seller shall not exceed sixty (60) days. In no event will closing occur more than one hundred eighty (180) days of the Effective Date of this Contract. If Buyer fails to close the purchase of the Lot as required by this Contract, Seller may declare Buyer in default by notice to Buyer with a copy to Escrow Agent, and Seller shall thereafter have the rights described in Section 12 below.

        Seller warrants that at the time of Closing or upon the granting of possession if at a time other than at Closing, the Lot will be in substantially the same condition as on the Effective Date, except for normal wear and tear, and changes made to the condition of the Lot pursuant to the written agreement of Buyer and Seller. If Seller can not fulfill the warranty reference above due to acts of god or circumstances beyond Seller's control, Buyer's sole remedy shall be to terminate this Agreement.

        7.      CONDITIONS TO CLOSING.

        a.      Seller's Obligations. Seller's obligations under this Contract are expressly conditioned upon Buyer's not being in default under any of the terms and conditions of this Contract.

        b.      Buyer's Obligations. Buyer's obligations under this Contract are expressly conditioned upon Seller's not being in default under any of the terms and conditions of this Contract.

**DRAFT**
**11/02/2007**

8.     CLOSING DOCUMENTS.  At the Closing, Buyer shall receive (i) good and marketable title to the Lot by a Special Warranty Deed to the Lot, subject to the Permitted Exceptions, (ii) Seller's form of Owner's (No Lien) Affidavit, (iii) an Affidavit of Non-Foreign Status ("**FIRPTA**") and (iv) a Settlement Statement (collectively, the "**Closing Documents**").  Concurrently with the Seller's delivery of the Closing Documents, Buyer shall execute and deliver any and all documents reasonably necessary or appropriate as requested by Seller or the Title Company, and shall pay the balance of the Purchase Price, as provided in Paragraph 3(b) above, and any additional amounts for closing costs that are to be paid by Buyer pursuant to Section 9.

9.     CLOSING COSTS.  Seller shall pay the cost of preparation of the Closing Documents and the State of Georgia property transfer tax.  Seller shall, at the time of closing, contribute a sum not to exceed $_____ to be used by Buyer.  Buyer agrees that, in addition to the Purchase Price for the Lot, Buyer is obligated at the Closing to pay certain other fees and closing costs.  Examples of these include, without limitation, the following:

a.     All costs of any financing obtained by Buyer, including, without limitation, any loan origination, service or documentation fees, credit searches and reports, appraisals, points or prepaid interest, mortgage insurance charges, mortgage title insurance premiums, tax service fees, or any other costs, fees, or charges imposed by Buyer's lender, the cost to record Buyer's mortgage, any documentary stamp taxes on the note or intangible taxes on the mortgage, and the cost of any surveys, tests or inspections required by Buyer or Buyer's lender.

b.     All title insurance premiums and charges.

c.     The fees and charges of any attorney utilized by Buyer and/or Buyer's lender.

d.     Buyer's share of real estate taxes, which shall be prorated as of the day of Closing based upon the current year's taxes.  If the current year's real estate tax bill is not available at the time of Closing, proration of taxes shall be based on the prior year's tax bill.  If the applicable tax bill also includes land other than the Lot, Buyer's pro rata share shall be equitably determined based on acreage.  In the event any proration is based on an estimate or a prior year's tax bill, either party may request a recalculation of the tax proration based upon the actual tax bill.  If Buyer's prorated share of the actual tax amount is at least Fifty Dollars ($50.00) higher or lower than the prorated amount paid by Buyer at Closing, then Buyer or Seller, as the case may be, shall reimburse the other.  This provision shall survive the Closing.

e.     Buyer's pro rata share of annual assessments, as defined in the Declaration, applicable to the Lot for the year of Closing and payable to the Association pursuant to the terms and conditions of the Declaration.  This provision shall survive the Closing.

10.    CONSTRUCTION OF INFRASTRUCTURE.  Buyer acknowledges that on the Effective Date, and at Closing, ingress and egress to the Lot by road or otherwise, water, sewer, electrical power, gas and telephone lines and other facilities and utilities will be completed for Phase 1 and will be available at the boundary line of the Lot ("**Phase 1 Infrastructure**").

Subject to the terms and conditions hereof, Seller shall construct or install, or cause to be constructed or installed, the infrastructure necessary to permit the development and use of future phases of Nature's Estates for residential purposes, consisting of, without limitation, underground electricity and telephone lines and facilities (the "**Future Infrastructure**").

Buyer acknowledges that construction of the Future Infrastructure may include modifying the grade of the Lot to an elevation consistent with the County's, or other applicable governmental entity's, requirements.  Such elevation modifications may require the removal of existing vegetation on the Lot. Additionally, utility appurtenances, including, without limitation, fire hydrants, meters, transformers, street lights, switchgear, and junction and telephone boxes, may be installed on or near the Lot.  Seller does hereby reserve, and may in the Special Warranty Deed from Seller to Buyer expressly reserve, a temporary construction easement over the Lot to permit Seller and/or its respective contractors to go upon the Lot in order to so modify the Lot and complete the Infrastructure.

4

**DRAFT**
**11/02/2007**

11.   THE DEVELOPMENT.

    a.   The Lot is located within and is part Phase 1 of a large-scale residential development ("**Development**") known as Nature's Estates Subdivision.

    In addition to the construction of the improvements required by the Plat, the Buyer acknowledges that Seller and others will construct additional improvements within the Development, and Seller hereby reserves the right to construct such improvements and develop its property within the Development without interference or objection from Buyer. Buyer acknowledges and agrees that Seller and/or its affiliates, contractors and subcontractors will be conducting excavation, construction and other activities in the vicinity of the Lot, both before and after the date of Closing, and Buyer recognizes their right to do so and hereby waives any claim that any of these activities are nuisances or offensive activities, or interfere in any manner whatsoever with Buyer's use and enjoyment of the Lot.

    Buyer hereby acknowledges that as a result of the size of the Development, the time period over which the Development will be built-out, and the need to obtain various governmental permits, approvals and consents, the Seller is hereby reserving the right, without obtaining the consent or approval of the Buyer, to alter, amend and modify its development plans for the Development. Buyer hereby acknowledges and agrees that all the master development plans which may have been presented to Buyer at any public hearing, at any public or private showings, or in any advertisements or promotional materials, or filed with any public entity, are for planning purposes only and will remain subject to change and modification until all improvements within the Development have been completed. The location of all improvements shown on the plans of the Development except for the Plat are shown for planning purposes only, and there is no assurance that any or all of the improvements will be constructed in the locations indicated on such plans.

    b.   Buyer agrees that it shall notify all of its subsequent grantees, successors and assigns of the terms and conditions set forth in this Section 11.

12.   DEFAULT.

    a.   If Buyer defaults under this Contract and after any applicable notice does not cure such default within any applicable cure period, Seller shall have the right to elect either of the following remedies: (i) to terminate this Contract, in which event Escrow Agent shall deliver the Deposit to Seller and Seller shall keep the Deposit and any other payments Buyer has then made as liquidated damages and not as a penalty (the parties acknowledging that the extent and amount of actual damages is uncertain and difficult to ascertain, and the Deposit is a reasonable good faith estimate of such damages, and agreeing that the amounts provided for above are liquidated damages and not a penalty); or (ii) to specifically enforce this Contract against Buyer.

    b.   In the event Seller defaults in the performance of any material term or condition of this Contract, Buyer shall give Seller notice of such default and if Seller has not commenced to cure the default within thirty (30) days after such notice is given, or should thereafter fail to complete the cure of such default within one hundred twenty (120) days after such notice is given, Buyer shall have the right to elect, within ten (10) days after the cure period expires by written notice to Seller, either of the following remedies: (i) to terminate this Contract and receive a refund of the Deposit in which event the Buyer and Seller shall be fully released of any and all obligations to the other; or (ii) to specifically enforce this Contract, provided any such suit is filed within thirty (30) days of notice of Buyer's election. In the event Seller defaults in the performance of any non-material term or condition of this Contract, Buyer's remedies shall not include the right to terminate this Contract. When Buyer elects one of the remedies available to Buyer as provided herein, which are the sole remedies available to Buyer, Buyer shall be deemed to have waived any other remedies. It is expressly agreed that in no event shall Buyer have the right or remedy of obtaining damages against Seller.

13.   ASSOCIATION AND COMMUNITY DOCUMENTS.

    a.   Association. Seller is the Declarant under the Declaration, as defined in Paragraph 5(c) above. Pursuant to the Declaration, the Declarant has established Nature's Estates Property Owners' Association, Inc. ("**Association**", as first defined above), a property owner's association. The Lot shall be conveyed subject to

5

**DRAFT**
**11/02/2007**

the terms and conditions of the Declaration. By owning the Lot, Buyer shall be liable for all assessments against the Lot. Pursuant to the Declaration, the Buyer's assessments may include Road Assessments, Special Assessments, and Annual Assessments, all as defined in the Declaration. Failure to pay any such assessments when due will result in the imposition of liens against the Lot and Buyer's improvements thereon. Declarant under the Declaration reserves the right to modify or supplement the Declaration in any manner whatsoever prior to the Closing. After the Closing, amendments and supplements to the Declaration may be made as provided in the Declaration. At Closing, Buyer agrees to accept all liabilities and obligations of membership in the Association.

      c.      <u>Architectural Review</u>. Buyer hereby acknowledges and agrees that any improvements to the Lot, including landscaping, shall (i) be subject to the architectural standards set forth in, and established from time to time pursuant to, the Declaration, and (ii) require the prior written approval of the Architectural Review Committee established pursuant to the Declaration ("ARC").

      d.      <u>Community Documents</u>. Prior to Closing, and as a condition to Closing, Buyer shall acknowledge receipt from Seller of copies of the following documents ("**Community Documents**"):

      1.      The Declaration, as then amended; and

      2.      Articles of Incorporation and Bylaws of the Association, as then amended.

Buyer acknowledges and agrees that the Community Documents permit the Declarant therein to make amendments to the Declaration and that any changes it makes to the Declaration after the Effective Date but prior to Closing shall be recorded with the office of the Clerk of Superior Court of Fannin County, Georgia, and any such amendments shall not excuse Buyer's obligation to perform any or all of Buyer's duties under this Contract. If this Contract is canceled for any reason, Buyer shall promptly return to Seller all of the Community Documents.

      e.      <u>Other Charges and Costs</u>. Except as otherwise expressly provided herein, after the Closing Buyer shall be solely responsible for all service charges, fees and assessments levied by public authorities and public or private utilities with respect to the Lot and Buyer's improvements constructed thereon. By owning the Lot, Buyer shall accept liability for all such charges, fees and assessments, and failure to pay same when due may result in the imposition of liens against the Lot and Buyer's improvements thereon.

      g.      <u>Acknowledgment of Receipt</u>. Buyer acknowledges receipt from Seller prior to executing this Contract of copies of the following:

      1.      A copy of the Plat, as recorded with the office of the Clerk of Superior Court of Fannin County, containing and identifying the Lot;

      2.      A copy of the Declaration, as amended;

      3.      Articles of Incorporation and Bylaws of the Association, as amended; and

    14.    <u>BROKER    AGENCY    DISCLOSURE;    COMMISSIONS;    DISCLAIMER    OF REPRESENTATIONS</u>.

      a.    _____("**Broker**"), and _____ ("**Sales Person**"), hereby disclose to Buyer that Broker is acting as the Real Estate Broker with respect to the purchase of the Lot solely on behalf of Seller as Seller's agent. In this Contract, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and, where the context would indicate, the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-I et. seq.

      b.    At Closing, Seller shall pay a sales commission due to Broker pursuant to a separate agreement by and between Seller and Broker. By signing this Contract, Buyer represents and warrants to Seller that Buyer has not consulted or dealt with any other broker, salesperson, agent or finder in connection with this Contract

6

**DRAFT**
**11/02/2007**

and that Buyer shall indemnify and hold Seller harmless for and from any claims of any such person or company claiming otherwise, including commissions, attorney's fees and court costs.

c. Buyer understands and acknowledges that the brokers and salespersons representing Seller in connection with this transaction do not have the authority to make any statements, promises or representations in conflict with, or in addition to, the information contained in this Contract and the Community Documents, and Seller and Broker hereby specifically disclaim any responsibility for any such statements, promises or representations. By execution of this Contract, Buyer acknowledges that Buyer has not relied upon any such statements, promises or representations, if any, and waives any rights or claims arising from any such statements, promises or representations.

d. Buyer and Seller acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Buyer and Seller agree that Brokers shall not be responsible to advise Buyer and Seller on any matter including but not limited to the following: any matter which could have been reveled through a survey, title search or inspection of Lot; the condition of Lot; old, hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of Lot; and condition(s) existing off Lot which may affect Lot; the terms and conditions and availability of financing; and the uses and zoning of Lot whether permitted or proposed. Buyer and Seller acknowledge that Brokers are not experts with respect to the above matters and that, if any of these matters or any other matters are of concern to them, they should seek independent expert advice relative thereto. Buyer and Seller acknowledge that Brokers shall not be responsible to monitor or supervise any portion of any construction or repairs to Lot and such tasks clearly fall outside the scope of the real estate brokerage services.

e. Buyer further acknowledges that in every neighborhood there are conditions which different buyers may find objectionable. Buyer shall therefore be responsible to become fully acquainted with neighborhood and other off site conditions which could affect the Lot. If Buyer is concerned about the possibility of a registered sex offender residing in a neighborhood in which Buyer is interested, Buyer should review the Georgia Violent Sex Offender Registry available on the Georgia Bureau of Investigation Website at www.state.ga.us/gbl/disclaim.html.

15.   ADDITIONAL DISCLOSURES BY SELLER TO BUYER. Seller hereby discloses the following matters to Buyer, and Buyer acknowledges that Buyer has read and understands these disclosures:

a. <u>Amenities.</u> The Lot may in the future be bordered by recreational amenities. The recreational amenities that may be built on or near the Lot from time to time will be privately owned by Seller, the Association, or others. Such amenities may include a clubhouse, tennis courts, pool, sidewalks, boardwalks, gatehouse, and streetlights.

b. <u>Construction Only by Featured Builders.</u> Buyer acknowledges and agrees that Seller, on behalf of itself and the prospective owners of all lots and properties within the Development, has a legitimate interest in assuring that all construction undertaken within the Development is of the highest quality and is conducted expeditiously and with the least possible disruption to adjacent and neighboring lots and properties so that property values within the Development may at all times be protected and maintained at the highest possible levels. Consequently, Buyer agrees that the construction of any and all improvements within the Development, including the single family residential dwelling contemplated to be constructed by Buyer on the Lot, must be undertaken only by, through or with one of the builders included on a list of Featured Builders for the Development, as such list may be amended by Seller from time to time ("**Featured Builders**"). Initially, it is anticipated that there will only be one (1) Featured Builder. The list of Featured Builders shall be made available to Buyer at Seller's on-site office at the Development. In the event that Buyer shall use and employ or attempt to use and employ any person or firm other than a Featured Builder to construct any such improvements on the Lot, Seller shall be entitled to enjoin any such construction by other than a Featured Builder without waiving any action for damages resulting from Buyer's breach.

Buyer further agrees that Seller has not made and is not making any representations, express or implied, to Buyer with regard to any Featured Builder, including, without limitation, the existence, nature and extent (including

7

coverage amounts and deductibles) of insurance policies that may be maintained by a Featured Builder from time to time, the solvency or financial status of a Featured Builder from time to time, the nature and amount of bonds, if any, that may be maintained by a Featured Builder from time to time, the performance (or the ability to perform) by a Featured Builder of its contractual obligations (including any contractual or warranty obligations of a Featured Builder in favor of Buyer), a Featured Builder's compliance with any building codes and other requirements, rules, laws and ordinances of federal, state and local government, and quasi-governmental entities and agencies relating to the construction of homes and other activities engaged in by a Featured Builder from time to time, and a Featured Builder's compliance with any licensing requirements imposed by federal, state and local governmental and quasi-governmental entities and agencies from time to time. Buyer agrees that Seller shall have no responsibility whatsoever for the use, escrow or maintenance of any sum Buyer may deposit with any Featured Builder, including, without limitation, any earnest money or other escrow deposit. Buyer agrees that Buyer's selection of a Featured Builder shall be conclusive evidence that Buyer has independently chosen the Featured Builder and has not received or relied upon any statements, advice or representations by Seller, its employees, agents and representatives, with respect to the Featured Builder's qualifications or ability to perform its contract obligations. Buyer hereby waives any and all claims and rights Buyer has or may have, now or in the future, against Seller, companies and persons affiliated with Seller, and their respective employees, directors, agents and representatives, arising from any contract(s) between Buyer and the Featured Builder and/or any agents of the Featured Builder or Seller's relationship with a Featured Builder. Neither Seller nor Broker is responsible in any manner for the performance of the obligations of the Featured Builder chosen by Buyer, and Buyer agrees to look solely to its home builder for the enforcement of any claims for nonperformance, breach of warranty or any other matter relating to the construction of Buyer's home on the Lot.

c.    No Guarantee of View.    Buyer acknowledges, understands, and agrees that the Lot is being sold by Seller and purchased by Buyer without any guarantee of the view from the Lot, and any view which the Lot currently enjoys may be impaired or obstructed by the future construction of houses, fences, walls, landscaping, and other improvements in the Development.

d.    Status of Permitting.    Buyer acknowledges, understands, and agrees that, at the time of the execution of this Contract, although Seller has obtained final permits necessary to allow Buyer's improvement of the Lot for Phase 1, and Seller is currently in the process of obtaining such necessary final permits and approvals for other phases of the Development. Such permits include, but may not be limited to, those permits necessary from the City, the Army Corps of Engineers, and other applicable governmental agencies for the construction of the Lot, amenities, if any, the surface water management system serving Nature's Estates Subdivision, environmental and wetland permits, and site and infrastructure permits. Buyer acknowledges that the Seller may be required from time to time to amend the Declaration and other governing documents of the Association to comply with the requirements of such governmental agencies.

e.    Commencement and Completion of Construction; Seller's Option Right and Repurchase Right.    Seller has reserved the exclusive right to create a fractional plan ("**Fractional Plan**") in portions of the Subdivision, whereby dwellings in the Subdivision could be divided into 1/12 fractional interests ("**Fractional Interests**"). It is currently Seller's intent to create the Fractional Plan; however, the documents creating the Fractional Plan are not currently available and the Fractional Interests will not be created prior to the Closing. Buyer acknowledges that Seller will not allow Buyer or any other purchaser of a lot in the Subdivision to operate a fractional program independent of the Fractional Plan.

Buyer must complete construction of a dwelling and fully furnish the dwelling on Buyer's Lot ("**Completion of Construction**") within twelve (12) months of Closing of this Contract. Completion of Construction mean when Buyer's dwelling receives a certificate of occupancy issued by the applicable governmental authority. Such dwelling constructed must be constructed in accordance with the specifications set forth in Attachment "A" of this Contract.

(1)    Buyer agrees that at such time that Seller creates the Fractional Plan, Seller shall have the option to repurchase and commit the Lot and the dwelling constructed thereon (collectively, the "**Home**") to the Fractional Plan to be created by Seller.

8

**DRAFT**
**11/02/2007**

Beginning (i) the date upon which Seller has contracted to sell seven (7) of the twelve (12) Fractional Interests for Buyer's Home; or (ii) sixteen (16) months after Closing of this Contract, whichever occurs first, and ending sixty (60) days thereafter, (the "**Option Period**"), Seller shall have the right to purchase the Home upon the terms and conditions set forth in this Contract (the "**Option Rights**"). The Option Rights shall be exercised, if at all, by Seller giving written notice (in accordance with the notice requirements of paragraph 16, below, to Buyer of Seller's desire to exercise the Option Rights (the "**Option Notice**").

Beginning eighteen (18) months after Closing and ending sixty (60) days thereafter (the "**Put Period**"), only if Completion of Construction has taken place, Buyer shall have the right to cause Seller to purchase the Home upon the terms and conditions set forth in this Contract (the "**Put Rights**"). The Put Rights shall be exercised, if at all, by Buyer giving written notice (in accordance with the notice requirements of Paragraph 16, below) to Seller of Buyer's desire to exercise the Put Rights (the "**Put Notice**").

Buyer acknowledges and agrees that: (i) that Seller may, prior to acquiring the Home, market Fractional Interests in the Home that will be subjected to the Fractional Plan, (ii) Seller has the right to inspect the Home prior to undertaking any responsibility to market the Fractional Interests in the Home; (iii) Buyer desires to retain one (1) Fractional Interest ~~[CONFIRM]~~; (iii) the price for the Home to be paid by Seller will be equal to $_____ (iv) closing costs (as described in Paragraph 9 above) associated with the purchase of the Home from Buyer will be paid by Buyer; and (v) Seller will not have a duty to sell Fractional Interests in Buyer's Home at a higher or equal priority than Fractional Interests owned by Seller or the Fractional Interests in dwellings belonging to other buyers of lots in the Subdivision what Seller exercises similar option rights. By executing this Contract, Buyer acknowledges and agrees that the demand for purchasers of Fractional Interests will be dictated by the market and such demand may vary or be nonexistent at a later date. Buyer further acknowledges and agrees that Seller makes no promise as to the marketability of the Fractional Interests or the success of such endeavor, and that Seller will only undertake to use commercially reasonable efforts to market the Fractional Interests in the Home.

(2)    <u>Failure to Build.</u>  Upon the failure of the Completion of Construction to occur within twelve (12) months of Closing of this Contract, Seller shall be entitled to (i) the right to repurchase ("**Repurchase Right**") the Lot; or (ii) or specific performance under this Contract. The repurchase price shall equal eighty percent (80%) of the purchase price paid by the then-current Owner, plus the actual cost of improvements made to such Lot by or on behalf of such Owner and its successors-in-title, if any. Buyer, or the then-current Owner, shall be obligated to pay any and all outstanding assessments or other charges due and owing under the Declaration and shall cure or cause to be cured all title defects or exceptions not existing at the time of the transfer of the Lot to the initial owner of the Lot by Seller. Real estate ad valorem taxes and prepaid assessments shall be prorated as of the date of closing of the repurchase of the Lot. All expenses related to the repurchase of the Lot shall be paid by Buyer, or the then-current Owner. Seller's Repurchase Right shall be subordinate and junior to all rights of institutional mortgagees. Notwithstanding anything to contrary contained in this Contract, Seller's Repurchase Right shall expire and be of not further force or effect upon the earlier to occur of (i) sixty (60) days after the issuance of the final certificate of occupancy by the controlling governmental authority with respect to a Home on the Lot; or (ii) upon the execution by Seller of a written waiver of Seller's Repurchase Right.

The provisions of this Section 15 shall survive Closing.

16.    <u>INSPECTION.</u>  Buyer and/or Buyer's representative shall have the right to enter the Lot at Buyer's expense and at reasonable times (including immediately prior to closing) to thoroughly inspect, examine, test, and survey the Lot for a period of _____ days after the Effective Date of this Contract. Buyer agrees to hold Seller and all Brokers harmless from all claims, injuries, and damages arising out of or related to the exercise of these rights. ~~[OR PROVIDE PART C PROPERTY AS IS?]~~

17.    <u>NOTICES.</u>  Any notices which may be permitted or required hereunder shall be in writing and shall be deemed to have been duly given as of the date and time the same are personally delivered, or within three (3) days after depositing with the U.S. Postal Service, postage prepaid by registered or certified mail, return receipt requested, or within one (1) day after depositing with an overnight delivery service from which a receipt may be obtained, and addressed as follows (either party may change its address by written notice to the other party):

9

**DRAFT**
**11/02/2007**

Buyer:                    _____
                          _____
                          _____
                          _____

Seller:                   Blue Ridge Georgia Capital Partners, LLC
                          2266 Three Rivers Drive
                          Orlando, Florida 32828
                          Attn: _____

To Broker:                _____
                          _____
                          _____
                          _____

To Escrow Agent:          James V. Johnstone, P.C.
                          P.O. Box 340
                          McCaysville, FA 30555
                          Attn: James V. Johnstone

18.    **TRANSFER OR ASSIGNMENT.** Buyer shall not assign, sell or transfer any interest in this Contract without the prior express written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion.

19.    **TYPEWRITTEN OR HANDWRITTEN PROVISIONS.** Typewritten or handwritten provisions initialed by all parties and inserted in this Contract or attached hereto as addenda shall control all printed provisions in conflict therewith.

20.    **OTHERS BOUND BY THIS CONTRACT.** This Contract shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. If Buyer has received permission from Seller to assign Buyer's interest in this Contract, this Contract shall bind the Buyer's permitted assignee(s).

21.    **ASSIGNMENT OF SELLER'S RIGHT.** Seller may assign any of the rights granted to Seller as described in this Contract in whole or in part to one or more persons or entities.

22.    **CLERK OF SUPERIOR COURT.** Buyer authorizes Seller to record the Community Documents and all documents necessary to establish and operate Seller's development and the portion of it in which the Lot is located, and such other documents as Seller deems necessary or appropriate, and all amendments and supplements to them, with the office of the Clerk of Superior Court of Fannin County, Georgia.

23.    **ATTORNEYS' FEES AND COSTS.** In any suit or other proceeding brought by either Buyer or Seller, the prevailing party shall be entitled to recover attorney's fees, costs and expenses actually incurred by the prevailing party in such suit or proceeding or in any appeal.

24.    **GEORGIA LAW; VENUE.** This Contract shall be governed by the laws of the State of Georgia, and venue shall be in any court of competent jurisdiction in Fannin County, Georgia.

25.    **TIME OF THE ESSENCE.** The performance of all obligations at the precise times stated in this Contract is of absolute importance, and failure to perform any of them on time is a default, time being of the essence.

26.    **RECORDING.** Neither this Contract or any notice or memorandum hereof may be recorded with the office of the Clerk of Superior Court of any county in Georgia; provided, however, Seller and Buyer agree to execute and have recorded with the office of the Clerk of Superior Court of Fannin County, Georgia, a Memorandum of Contract for Lot Purchaser and Notice of Repurchase Rights (Nature's Estates Subdivision), the

10

**DRAFT**
**11/02/2007**

form of which is attached hereto and incorporated herein as Addendum "C". No other notice or memorandum regarding this Contract may be recorded with the Clerk of Superior Court of any county in Georgia.

27.    ESCROW. Any Escrow Agent receiving the Deposit or other funds or equivalent is authorized and agrees by acceptance thereof to deposit promptly and to hold same in escrow and, subject to collection thereof, to disburse same in accordance with the terms and conditions of this Contract. Failure of clearance of funds shall not excuse performance by Buyer. In the event of doubt as to Escrow Agent's duties or liabilities under the provisions of this Contract, the Escrow Agent may in its sole discretion, continue to hold the subject matter of this escrow until the parties mutually agree to the disbursement thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or Escrow Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute, and upon notifying all parties concerned of such action, all liability on the part of the Escrow Agent shall fully terminate, except to the extent of accounting for any items theretofore delivered out of escrow. In the event of any suit between Buyer and Seller wherein the Escrow Agent is made a party by virtue of acting as an Escrow Agent hereunder, or in the event of any suit wherein Escrow Agent interpleads the subject matter of this escrow, the Escrow Agent shall be entitled to recover reasonable attorney fees and costs incurred, said fees and costs to be charged and assessed as court costs in favor of the prevailing party. All parties agree that the Escrow Agent shall not be liable to any party or person whomsoever for misdelivery to Buyer or Seller of items subject to this escrow, unless such misdelivery shall be due to willful breach of this Contract or gross negligence on the part of the Escrow Agent.

28.    TAXES. **BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO THE PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.**

29.    GENDER. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular as the context may require.

30.    BUYER'S STATE OF RESIDENCE. Buyer hereby represents and warrants to Seller that Buyer is a resident of the state set forth in the address given for Buyer in the opening paragraph of this Contract.

31.    ENTIRE AGREEMENT AND SURVIVAL OF TERMS. This Contract includes the attached Addendum "A", Addendum "B", and Addendum "C". The items and conditions stated in such addendum and exhibit shall control and prevail to the extent, if any, that they vary from or conflict with other terms of this Contract. This Contract, together with Addendum "A", Addendum "B", and Addendum "C" constitute the entire agreement between the Seller and Buyer with respect to the Lot and the Development. This Contract may only be amended in writing executed by both Buyer and Seller.

ANY CURRENT OR PRIOR UNDERSTANDINGS, STATEMENTS, REPRESENTATIONS, UNDERTAKINGS, INCENTIVES OR AGREEMENTS, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, RENDERINGS OR REPRESENTATIONS CONTAINED IN BROCHURES, ADVERTISING, PROMOTIONAL OR SALES MATERIALS AND ANY ORAL OR WRITTEN STATEMENTS OF SALES REPRESENTATIVES, IF NOT SPECIFICALLY EXPRESSED IN THIS CONTRACT OR IN THE COMMUNITY DOCUMENTS, ARE VOID AND HAVE NO FORCE OR EFFECT AND BUYER ACKNOWLEDGES AND AGREES THAT BUYER HAS NOT RELIED ON ANY SUCH ITEMS. BUYER HEREBY WAIVES ANY AND ALL CLAIMS AGAINST SELLER AND BROKER WITH RESPECT TO SUCH ITEMS.

32.    EFFECTIVE DATE. When used herein, the term "Effective Date" or the phrase "the date hereof" shall mean the last date on which either Buyer or Seller executes this Contract.

33.    COMPLETION DATES. COMPLETION DATES FOR ANY OF THE PROPOSED OR PLANNED IMPROVEMENTS OR AMENITIES IN THE DEVELOPMENT APPEARING IN ANY SALES BROCHURES, ADVERTISEMENTS, PROMOTIONAL MATERIALS OR IN ANY OTHER INFORMATION

11

**DRAFT**
**11/02/2007**

WHICH BUYER HAS OR MAY HAVE RECEIVED FROM SELLER OR BROKER ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, GOVERNMENTAL APPROVALS AND PERMITS, EVENTS OF EXCUSABLE DELAY, CHANGES IN PLANS AND CONSTRUCTION SCHEDULES, CONTRACTOR AVAILABILITY, WEATHER, AND THE NUMBER AND TIMING OF OTHER LOT SALES WITHIN THE DEVELOPMENT.  THERE IS NO GUARANTEE THAT THESE DATES ARE ACCURATE, AND THE DATES MAY CHANGE AT ANY TIME.  SELLER SHOULD BE CONSULTED PERIODICALLY FOR SCHEDULE UPDATES.  IN NO EVENT SHALL SELLER, BROKER OR ANY OF THEIR RESPECTIVE EMPLOYEES OR CONSULTANTS BE LIABLE FOR ANY CHANGES IN CONSTRUCTION COMPLETION DATES.

BUYER IS ADVISED TO REVIEW CAREFULLY ALL TERMS, CONDITIONS, PROVISIONS, DISCLAIMERS AND DISCLOSURES APPEARING IN THIS CONTRACT AND ANY ADDENDA ATTACHED HERETO AND MADE A PART HEREOF.

**BUYER ACKNOWLEDGES THAT A COPY OF THE FEDERAL PROPERTY REPORT RELATING TO SELLER'S DEVELOPMENT HAS BEEN DELIVERED TO BUYER.**

Buyer and Seller hereby enter into this Contract intending to be legally bound thereby to perform their respective obligations hereunder.  This Contract has been executed by Buyer and Seller under seal as of the dates indicated below.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

12

**DRAFT**
**11/02/2007**

Witness:

                **SELLER:**

                **BLUE RIDGE GEORGIA CAPITAL PARTNERS, LLC, a Florida limited liability company**

_____

Signature of Witness

                **By: Avia Management, LLC,** a Florida limited liability company, as Manager of Blue Ridge Capital Partners, LLC

_____

Printed Name of Witness

                        **By: Mountain Tracks Developing and Building, LLC,** a Georgia limited liability company, as Manager of Avia Management LLC.

_____

Signature of Witness

                        By: _____

_____                   Print Name:_____

Printed Name of Witness           Title: _____

13

**DRAFT**
**11/02/2007**

Witness:                                    **BUYER:**

_____              _____
Signature of Witness                        Signature of Buyer

_____              _____
Printed Name of Witness                     Printed Name of Buyer

_____
Signature of Witness

_____
Printed Name of Witness

_____              _____
Signature of Witness                        Signature of Buyer

_____              _____
Printed Name of Witness                     Printed Name of Buyer

_____
Signature of Witness

_____
Printed Name of Witness

14

**DRAFT**
**11/02/2007**

### ADDENDUM "A"

### FINANCING ADDENDUM

### PHASE 1 OF NATURE'S ESTATES SUBDIVISION

This Financing Addendum to Contract for Lot Purchase and Option to Repurchase for Phase 1 of Nature's Estates Subdivision ("**Addendum**") is an addendum to that certain Purchase Contract ("**Contract**") by and between **BLUE RIDGE GEORGIA CAPITAL PARTNERS, LLC**, a Florida limited liability company ("**Seller**") qualified to do business in the state of Georgia and having an address of 2266 Three Rivers Drive, Orlando, Florida 32828 and _____ ("**Buyer**"), whose address and other identification information is as follows:

| | |
|---|---|
| *NAME* | *Social Security No.* |

*Address*

| | | |
|---|---|---|
| *City* | *State* | *ZIP* |

Capitalized terms used in this Addendum shall have the same meaning ascribed to such terms in the Contract. Purchaser desires to obtain financing for the purchase of the Unit and Developer desires to grant Purchaser a reasonable amount of time to obtain such financing. Consequently, the terms of the Contract are subject to and modified by the following:

Buyer shall: (a) make application for the primary loan ("**Primary Loan**") within _____ days from the Effective Date of the Contract; (b) immediately give notice to Seller of having applied for such loan (or any subsequent loan), the name and telephone number of the lender and the name and telephone number of the loan originator; and (c) pursue qualification for and approval of such loan diligently and in good faith. Buyer hereby authorizes Buyer's lender to release information to Seller and Seller's Broker verifying the amount and terms of any loan for which Buyer has applied. Should Buyer not timely apply for the Primary Loan, Seller may terminate the Contract if Buyer does not cure the default within five (5) days after receiving written notice thereof, by providing Seller with written evidence of having applied for such loan. Notwithstanding the above, Buyer may fulfill the obligation to apply for the Primary Loan by applying for any other available loan with terms for which Buyer may more easily qualify. Buyer shall be obligated to close this transaction if Buyer has the ability to obtain the Primary Loan or any other loan for which Buyer has applied and been approved. Prior to closing, Buyer shall not intentionally make any material changes in Buyer's financial condition which would adversely affect Buyer's ability to obtain the Primary Loan or any other loan referenced in the Contract. In the event any application of Buyer for a loan on the Lot is denied, Buyer shall promptly provide Seller with a letter from the lender denying the loan detailing all of the reasons for the denial.

IN WITNESS WHEREOF, the parties have caused this Addendum to be executed as of the dates set forth below.

**BUYER:**

| | |
|---|---|
| Buyer | Date |

| | |
|---|---|
| Buyer | Date |

**DRAFT**
**11/02/2007**

<u>**SELLER:**</u>

**BLUE RIDGE GEORGIA CAPITAL PARTNERS,**
**LLC, a Florida limited liability company**

      **By: Avia Management, LLC,** a Florida limited liability
      company, as Manager of Blue Ridge Capital Partners, LLC

           **By: Mountain Tracks Developing and Building,**
           **LLC,** a Georgia limited liability company, as
           Manager of Avia Management LLC.

                By: _____
                Print Name:_____
                Title: _____

**DRAFT**
**11/02/2007**

## ADDENDUM "B"

## HOME BUILDING SPECIFICATION AND FURNISHINGS ADDENDUM

[INSERT DETAIL FROM BUILDER HERE]

**DRAFT**
**11/02/2007**

### ADDENDUM "C"

### MEMORANDUM OF CONTRACT FOR LOT PURCHASE
### AND NOTICE OF REPURCHASE RIGHTS
### (NATURE'S ESTATES SUBDIVISION)

**DRAFT**
**11/02/2007**

MEMORANDUM OF CONTRACT FOR LOT PURCHASE
AND NOTICE OF REPURCHASE RIGHTS
(NATURE'S ESTATES SUBDIVISION)

THIS MEMORANDUM OF CONTRACT FOR LOT PURCHASE AND NOTICE OF REPURCHASE RIGHTS (this "**Memorandum**") is made and entered this ____ day of _____, 20___ by and between **BLUE RIDGE GEORGIA CAPITAL PARTNERS, LLC**, a Florida limited liability company ("**Seller**") qualified to do business in the state of Georgia and having an address of 2266 Three Rivers Drive, Orlando, Florida 32828 and ____ _____ ("**Buyer**"). Capitalized terms not defined in this Memorandum shall have the meanings ascribed to such terms in the Purchase Contract (as defined below), unless the context otherwise requires and states.

R E C I T A L S

WHEREAS, Buyer and Seller entered into that certain Contract for Lot Purchase ("**Contract**") dated _____, 20____ whereby Buyer agreed to purchase from Seller the following property:

Lot No. ____, as shown on _____ [INSERT DESCRIPTION OF PLAT] as recorded in Plat Hanger____ at Pages _____, inclusive, in the office of the Clerk of Superior Court _____ Fannin County, Georgia (the "**Plat**").

The above-referenced lot (the "**Lot**"), along with all improvements located thereon, is hereinafter referred to as the "**Property**".

WHEREAS, the Property is subject to (i) the Declaration of Covenants, Conditions, Restrictions and Easements for Nature', recorded _____, 20__, in Book _____, Page _____, in the office of the Clerk of Superior Court of Fannin County, Georgia ("**Declaration**"); and

WHEREAS, the Purchase Contract grants to Seller the right of repurchase ("**Repurchase Right**"), pursuant to certain terms and conditions set forth in the Purchase Contract, including, without limitation, Buyer's failure to meet certain deadlines established for the commencement and completion of construction.

WHEREAS, the intent of this Memorandum is to put all persons whomsoever on notice of the existence of the Repurchase Right set forth in the Agreement.

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00), the mutual covenants and obligations set forth in the Purchase Contract, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer acknowledges and agrees to the following.

1.    Repurchase Right.   Seller shall have the right to repurchase ("**Repurchase Right**") the Lot upon the failure of the Completion of Construction to occur within eighteen (18) months of Closing of this Contract. The repurchase price shall equal eighty percent (80%) of the purchase price paid by the then-current Owner, plus the actual cost of improvements made to such Lot by or on behalf of such Owner and its successors-in-title, if any. Buyer, or the then-current Owner, shall be obligated to pay any and all outstanding assessments or other charges due and owing under the Declaration and shall cure or cause to be cured all title defects or exceptions not existing at the time of the transfer of the Lot to the initial owner of the Lot by Seller. Real estate ad valorem taxes and prepaid assessments shall be prorated as of the date of closing of the repurchase of the Lot. All expenses related to the repurchase of the Lot shall be paid by Buyer, or the then-current Owner.

2.    Release of Repurchase Right.   Seller's Repurchase Right shall be subordinate and junior to all rights of institutional mortgagees. Notwithstanding anything to contrary contained in this Contract, Seller's Repurchase Right shall expire and be of not further force or effect upon the earlier to occur of (i) sixty (60) days after the issuance of the final certificate of occupancy by the controlling governmental authority with respect to a Home on the Lot; or (ii) upon the execution by Seller of a written waiver of Seller's Repurchase Right.

DRAFT
11/02/2007

3.      Intent of Notice.  This Memorandum is intended to provide notice of the Repurchase Right.

1.      Assignment of Seller's Right.  Seller may assign any of the rights granted to Seller as described herein in whole or in part to one or more persons or entities.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**DRAFT**
**11/02/2007**

    **IN WITNESS WHEREOF,** the parties have caused this Memorandum to be executed in its name as of the day and year first written above.

Witness:

                      **SELLER:**

                      **BLUE RIDGE GEORGIA CAPITAL PARTNERS, LLC, a Florida limited liability company**

_____
Signature of Witness

                      **By: Avia Management, LLC,** a Florida limited liability company, as Manager of Blue Ridge Capital Partners, LLC

_____
Printed Name of Witness

                          **By: Mountain Tracks Developing and Building, LLC,** a Georgia limited liability company, as Manager of Avia Management LLC.

_____
Signature of Witness

                          By: _____
                          Print Name:_____

_____
Printed Name of Witness

                          Title: _____

**DRAFT**
**11/02/2007**

Witness:                                    **BUYER:**

_____              _____
Signature of Witness                  Signature of Buyer

_____              _____
Printed Name of Witness               Printed Name of Buyer

_____
Signature of Witness

_____
Printed Name of Witness

_____              _____
Signature of Witness                  Signature of Buyer

_____              _____
Printed Name of Witness               Printed Name of Buyer

_____
Signature of Witness

_____
Printed Name of Witness

**DRAFT**
**11/02/2007**

STATE OF _____ )
                          )ss.
COUNTY OF _____ )

     The foregoing instrument was acknowledged and executed before me this ___ day of _____, 20__, by _____, as _____ of Mountain Tracks Developing and Building, LLC, as Manager of Avia Management, LLC, as Manager of Blue Ridge Georgia Capital Partners, LLC. He/She is personally known to me or has produced _____ as identification.

                                     _____
                                     Notary Signature

(NOTARY SEAL)

                                     _____
                                     Printed Name of Notary
                                     NOTARY PUBLIC
                                     Commission No. _____

STATE OF _____ )
                          )ss.
COUNTY OF _____ )

     The foregoing instrument was acknowledged and executed before me this ___ day of _____, 200__, by _____, who is personally known to me or has produced _____ as identification.

                                     _____
                                       Notary Signature

(NOTARY SEAL)

                                     _____
                                     Printed Name of Notary
                                     NOTARY PUBLIC
                                     Commission No. _____

**DRAFT**
**11/02/2007**

STATE OF _____ )
                                             )ss.
COUNTY OF _____ )


    The foregoing instrument was acknowledged and executed before me this ___ day of _____, 200__, by _____, who is personally known to me or has produced _____ as identification.


(NOTARY SEAL)

                                _____
                                Notary Signature

                                _____
                                Printed Name of Notary
                                NOTARY PUBLIC
                                Commission No._____