# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JONATHAN NOBLE, an individual,
ARLENE NOBLE, an individual; GSS
INTERNATIONAL MNG LLC, a California
Limited Liability Company, SHMUEL GOSHEN,
an individual; SHULAMIT GOSHEN, an
individual; SAMUEL LI, an individual; and
LILLIAN HAN,
an individual,

                       **Plaintiffs**

v.                                            **Case No.  6:10-CV-01331-JA-DAB**

BRENT BALDASARE, WHITNEY HARP, J.W.
STEPHENS, and LEON SACCO, individually,

                       **Defendants.**

_____

## DEFENDANTS' (BALDASARE AND HARP'S) MOTION FOR FULL OR PARTIAL SUMMARY JUDGMENT

The Defendants, BRENT BALDASARE (hereinafter, "BALDASARE") and WHITNEY HARP (hereinafter, "HARP" and collectively with BALDASARE, "these Defendants"), pursuant to Fed. R. Civ. P. 56, hereby move the Court for a Summary Judgment in favor of these Defendants, and against the Plaintiffs, because the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits filed herein, reveal there is no genuine dispute as to any material fact and that these Defendants are entitled to a judgment as a matter of law.  The grounds upon which this motion is based and the substantial matters of law to be argued include:

## Summary of Grounds

A summary of the grounds for this motion is as follows:

I.      All of the alleged "Buy Back Agreements" are so indefinite on their faces as to not constitute enforceable contracts, thereby making the Guarantee for same unenforceable.

II.     The GOSHENS' Guarantee does not name them as Obligees, thereby making their alleged Guarantee so indefinite on its face to make it unenforceable.

III.    ARLENE NOBLE's name does not appear as an Obligee on the Guarantee upon which the NOBLES rely, thereby making the NOBLES' alleged Guarantee so indefinite on its face as to make her claim under the Guarantee unenforceable.

IV.     Plaintiffs failed to comply with O.C.G.A §13-1-11(a)(3) requiring written notice to these Defendants that the provisions of the Guarantees concerning attorneys' fees would be enforced and requiring payment by a specified deadline, so the Plaintiffs' claims for attorneys' fees are barred.

V.      Plaintiffs improperly relied upon an unauthorized individual, as the alleged agent for these Defendants, to provide them with the subject Guarantee forms without ever confirming in a writing the authority of the agent to deliver the executed documents for these Defendants to the Plaintiffs, and consequently, no Personal Guarantee agreements were formed.

VI.     GSS INTERNATIONAL MNG, LLC is a named Plaintiff in this action in some connection with the GOSHENS, yet it is not referenced in any of the contractual documentation upon which the GOSHENS rely, there are no allegations in the First Amended Complaint indicating that it has any interest whatsoever in the transactions that are the subject of this case, and therefore, any claim by it should be dismissed, as a matter of law.

–2–

## Nature of This Action

This is an action brought by three sets of Plaintiffs to recover damages under three Personal Guarantees against the Defendants/movants, WHITNEY HARP and BRENT BALDASARE, whom the Plaintiffs claim to be obligated under the Personal Guarantees to purchase from the Plaintiffs certain real property[1]. (Doc. 40, ¶ 24, 26-29, 36, 38-41, 48, and 50-42.) The Plaintiffs purchased certain real property in Georgia, and they claim at the same time to have entered into what they have described as "Buy Back Agreements," which allegedly provided them with an obligation of the seller of the real properties, Blue Ridge Capital Properties, LLC, a Florida LLC, to "repurchase" them at the end of a two-year period for a specified significant profit. (Doc. 40, ¶ 24, 26-29, 36, 38-41, 48, and 50-42.)

## The Parties

The Plaintiffs are JONATHAN NOBLE and ARLENE NOBLE, his wife, GSS INTERNATIONAL MNG, LLC, a California Limited Liability Company, SHMUEL GOSHEN, SHULAMIT GOSHEN, SAMUEL LI, and LILLIAN HAN. With the exception of the Plaintiff, GSS INTERNATIONAL MNG, LLC, the NOBLES, the GOSHENS, LI, and HAN are three married couples residing in California, according to their First Amended Complaint. (Doc. 40, ¶ 1, 3, and 5.)

Paul W. Flesh and Andrew Shumway originally were defendants in this action (Doc. 1), but

---

1    References to pleadings, discovery, and other documents filed in this action shall be made parenthetically in the text hereof and proximate to the textual reference with "Doc." (meaning "Document,") followed by the number assigned to the referenced document in the Clerk's docket and a paragraph reference, if available and appropriate, within the document.  If Requests for Admission and Responses to same, or Interrogatories and Answers to same, are referenced, the document number for the responsive discovery item is noted first with the words, "in response to," and the document number of the discovery item that elicited the response.

when the First Amended Complaint was filed, they were dropped as parties, apparently because they previously were granted discharges in bankruptcies in which they scheduled claims of the Plaintiffs or in which the claims of the Plaintiffs otherwise apparently were considered discharged. (Doc. 18, Doc. 21, and Doc. 32.)   The remaining Defendants in this action are BRENT BALDASARE, WHITNEY HARP, and LEON SACCO, who all are residents of the State of Florida (Doc. 43, ¶ 9; Doc. ¶¶ 6 and 7), and J. W. STEPHENS, who is believed to have been a resident of the State of Georgia at the time this action was filed. (Doc. 40, ¶ 8.) Although he filed for bankruptcy and apparently was discharged, he remains a party in this action. (Doc. 30 and Doc. 32.)

## The Essential Background Facts

Paul W. Flesh, Andrew Shumway, BRENT BALDASARE, WHITNEY HARP, LEON SACCO, and J. W. STEPHENS were connected with a Florida limited liability company registered to do business in the State of Georgia, namely, Blue Ridge Georgia Capital Partners, LLC (hereinafter, "BRG"), the entity that sold real property to the Plaintiffs. (Doc. 50 and Doc. 51, ¶ 3.) Paul W. Flesh, Andrew Shumway, BRENT BALDASARE, and WHITNEY HARP's connection with BRG was through one of its managing member entities, Avia Management, LLC, another Florida limited liability company (hereinafter, "Avia Management"), in which BRENT BALDASARE and WHITNEY HARP each owned a 25% membership interest. (Doc 50 and Doc. 51, ¶ 3) Avia Management owned about a 28% interest in BRG. (Doc 50 and Doc. 51, ¶ 3.)

BRG's other owners included the wife of Defendant, LEON SACCO, namely, Corina Sacco, who held about a 20% interest directly in BRG, a group of individual investors (9 or more), who held about a 22% interest in BRG, and Mountain Tracks Developing & Building, LLC, a

Georgia limited liability company (hereinafter, "Mountain Tracks"), which held a 30% interest in

BRG. (Doc. 50 and Doc. 51, ¶ 4.)  BRENT BALDASARE, and WHITNEY HARP understood at

all times that Mountain Tracks was wholly owned and run by J.W. STEPHENS.  (Doc. 50 and

Doc. 51, ¶ 4.)

      At all times relevant hereto, Resort & Spa Investments, LLC, a Florida limited liability

company, had as its members and managers, WHITNEY HARP, Andrew Shumway, Paul Flesh,

J.W. STEPHENS, LEON SACCO, and BRENT BALDASARE, who are believed to have all

owned equal interests of 20% each in that entity.  (Doc. 50 and Doc. 51, ¶ 4.)

      The entities described above were involved in the development of a mountain resort

community known as Nature's Estates Resort & Spa at Paris Mountain, or simply as Nature's

Estates, which was located near Blue Ridge, Georgia.  (Doc. 50 and Doc. 51, ¶ 6.)  BRG was the

owner of the real property on which the development was located.  (Doc. 50 and Doc. 51 ¶ 6.)

Resort & Spa Investments, LLC was formed with the idea of its being the vehicle for developing,

marketing, and selling a fractional shares program (similar to a timeshare program, in certain

respects) using the subdivided lots at Nature's Estates that were to be improved with first class

cabin homes and other amenities (equestrian stable, concierge services, restaurant, club house, and

pool area, etc.) for that purpose.  (Doc. 50 and Doc. 51, ¶ 6.)

      In late 2008, Paul W. Flesh, who was running the development process in conjunction with

J.W. STEPHENS and Andrew Shumway for BRG, proposed to the other investors in the project,

including WHITNEY HARP and BRENT BALDASARE, that they needed to obtain an injection

of additional capital into the project to allow a paydown on the mortgage financing against the real

property for the project and allowing for one of the entities involved in the project or a new one to

obtain construction financing so that the fractional shares marketing and sales could begin.  (Doc

50 and Doc. 51, ¶ 7.)  The sales of the fractional shares were intended to provide the ongoing cash flow that would be necessary to continue operations in the development and sales process.  (Doc 50 and Doc. 51, ¶ 7.)

Paul W. Flesh provided an analysis of the finances for the project showing that BRG minimally needed to sell 17 lots at around $150,000.00 per lot to be able to pursue the proposal he was making for an injection of capital.  (Doc. 50 and Doc. 51, ¶ 8.)  Paul W. Flesh referred to what BRG was doing as "land banking," because it would allow its members, once it had generated enough sales of the fractional share interests, to obtain control of the 17 lots again and to maintain control of the completion of the project.  (Doc. 50 and Doc. 51, ¶ 8.)

BRENT BALDASARE became involved in the process of searching for an investment group or entity that could make the necessary 17-lot purchase, and he eventually connected with a group known as Full Circle Resort Properties, LLC (hereinafter, "Full Circle").  (Doc. 50 and Doc. 51, ¶ 9.)  Negotiations with Full Circle progressed very nicely to the point that, primarily through the efforts of Paul W. Flesh, a fractional shares sales specialist named Terry Weaver, and a representative of Full Circle named Charles "Chuck" Rutland (and to a much lesser extent, BRENT BALDASARE), extensive documentation was prepared, including a Letter of Intent dated January 6, 2008 and related detailed documents.  (Doc. 51, ¶ 9.)  A copy of the Letter of Intent and the related documents is attached to Brent Baldasare's Affidavit filed on behalf of the movants as Exhibit "A."  (Doc. 51, ¶ 9.)

Full Circle had insisted that as part of the lot "buy back" program, the individuals behind BRG, Mountain Tracks, and Avia Management would have to provide their individual Guarantees for the "buy back" obligation of the entity that would be obligated to make the purchase, except that instead of Corina Sacco, her husband (and the movants' co-Defendant), LEON SACCO,

would need to sign the Guarantee. (Doc. 50 and Doc. 51, ¶ 10.) Therefore, a Personal Guarantee form similar or identical to the form upon which the Plaintiffs in this action rely was drafted by Full Circle's attorney. (Doc. 50 and Doc. 51, ¶ 10.)

Three identical duplicate originals of the partially executed Guarantee form were given by Paul W. Flesh to BRENT BALDASARE, but they had not been executed by all of the other proposed Guarantors. (Doc. 50 and Doc. 51, ¶ 11.) In particular, WHITNEY HARP AND BRENT BALDASARE recall for certain that J. W. STEPHENS and LEON SACCO's signatures were not present. (Doc. 50 and Doc. 51, ¶ 11.) WHITNEY HARP insisted that all other proposed Guarantors' signatures should be on the documents before he would sign them, and BRENT BALDASARE followed his lead in this regard. (Doc. 50 and Doc. 51, ¶ 11.) They returned the original partially executed forms to Paul W. Flesh with the advice that they would not sign the forms until he provided them with all of the other proposed Guarantors' signatures. (Doc. 50 and Doc. 51, ¶ 11.)

Paul W. Flesh later provided BRENT BALDASARE with three duplicate originals of same apparently executed by all other Guarantors besides WHITNEY HARP and him, so they proceeded to execute all three of the documents. (Doc. 50 and Doc. 51, ¶ 12.) The blank for the name(s) of the Obligee(s) was left incomplete on each of the forms, because all of the proposed Guarantors understood that there was a possibility some other entity could be involved in the transaction besides Full Circle, which actually was acting as a conduit-entity for various other individuals and/or entities. (Doc. 50 and Doc. 51, ¶ 12.) In other words, it was quite possible that Full Circle would assign its rights in the deal, or that another entity would be chosen, subject to the proposed Guarantors' approval. (Doc. 50 and Doc. 51, ¶ 12.) BRENT BALDASARE provided the three duplicate original fully executed Personal Guarantee forms (but with no names inserted in the

blanks for the names of the Obligee(s)) back to Paul W, Flesh for him to hold them for later use

once the deal with Full Circle was finalized and was ready to be closed.  (Doc. 50 and Doc. 51, ¶

12.)   WHITNEY HARP and BRENT BALDASARE believe that the events described in this

paragraph occurred in early 2008. (Doc. 50 and Doc. 51, ¶ 12.)

The Guarantee document was signed in triplicate with the idea that one version of the

document would be given to the purchaser of the 17 lots, another would be given to the closing

agent, and another would be given to BRG.  (Doc. 50 and Doc. 51, ¶ 13.)  Once they returned the

fully executed Guarantee agreements to Paul W. Flesh, that was the last WHITNEY HARP and

BRENT BALDASARE saw of them.  (Doc. 50 and Doc. 51, ¶ 13.)  They now have only seen

copies produced by the Plaintiffs in this action of what appear to be the same documents.  (Doc. 50

and Doc. 51, ¶ 13.) Neither WHITNEY HARP nor BRENT BALDASARE would have executed

the Guarantee documents if they had known that they had not been completely executed by all

other Guarantors, and especially if they had known that any of the signatures for the Guarantors

had been forged.  (Doc. 50 and Doc. 51, ¶ 13.)  They have learned only since the beginning of this

case that J. W. STEPHENS swears that his signature was forged by someone without his

knowledge or permission on the Personal Guarantees on which the Plaintiffs rely in this action.

(Doc. 50 and Doc. 51, ¶ 13; Doc. 48-1, ¶ 3.)

After WHITNEY HARP and BRENT BALDASARE had executed the Guarantee

documents, they learned from Paul W. Flesh that the deal with Full Circle had fallen through.

(Doc. 50 and Doc. 51, ¶ 14.)  By that time in the first half of 2008, the banking crisis had made

financing for most real estate projects almost impossible, so the Nature's Estates project's progress

slowed. (Doc. 50 and Doc. 51, ¶ 14.)  Apparently, during this timeframe, even though he knew that

the "buy back" program and the executed Personal Guarantees were not supposed to be used for

anything other than for a 17-lot transaction with Full Circle or with some other entity or individual (s) who could complete a 17-lot purchase, Paul W. Flesh apparently completed sales of only 4 lots by BRG to the Plaintiffs involving the "buy back" concept and the Personal Guarantees.  (Doc. 50 and Doc. 51, ¶ 14.)

Those actions of Paul W. Flesh never were approved by the managing members of BRG, namely, Mountain Tracks and Avia Management.  (Doc. 50 and Doc. 51, ¶ 15.)  WHITNEY HARP and BRENT BALDASARE certainly did not approve them or know about them.  (Doc. 50 and Doc. 51, ¶ 15.)  During this time, BRENT BALDASARE remained busily involved in his chiropractic practice in the East Orlando area while also doing what he could to work with WHITNEY HARP on local real estate development projects in which they were involved with some of the individuals from the Nature's Estates group.  (Doc. 51, ¶ 15.)  At the same time, WHITNEY HARP also remained busily involved in the his real estate development work in the East Orlando area on the same real estate development projects as  BRENT BALDASARE.  (Doc. 50 and Doc. 51, ¶ 15.)  Those obligations and activities of BRENT BALDASARE and WHITNEY HARP probably contributed to their being less informed about activities involving the Nature's Estates project than they might otherwise have been.  (Doc. 50 and Doc. 51, ¶ 15.)

## **Memorandum of Law**

## **Law of Georgia is Applicable**

The "Buy Back Agreements" upon which the Plaintiffs rely as the underlying agreements for the Personal Guarantees that they seek to enforce in this action all provide at Paragraph 11.c. the following:

> **Governing Law:** This Agreement may be signed in multiple counterparts and shall be interpreted in accordance with the laws of the State of Georgia.

(Bold fonts in original.)  (Doc. 49-7, 49-8, and 49-9, ¶2 in each; responding to Doc. 49-1, 49-2, and

49-3, ¶ 1 in each.)  Such a contractual provision ordinarily is enforceable absent contrary public

policy.  *Kellogg v. Food Service Supplies, Inc.*, 541 S.E. 2d 683, 684, n.5 (Ga. App. 2000).

Although the Personal Guarantee agreements upon which the Plaintiffs are relying in this

action do not have a specific choice of law provision such as the one quoted above from the "Buy

Back Agreements," they all make specific reference to the Georgia Code Annotated in reference to

the purported liability of the members of Resort and Spa Investments, LLC. (Doc. 49-7, 49-8, and

49-9, ¶ 1 in each, responding to Doc. 49-1, 49-2, and 49-3, ¶ 1 in each.)

The subject of the transactions underlying the Personal Guarantees was real estate located

in the State of Georgia, and the transactions were to occur there, including any that were to occur

pursuant to the Personal Guarantees, which required the Guarantors to "be personally liable for the

sale, buy-back provision of the contract to which it is attached." (Doc. 49-7, 49-8, and 49-9, ¶ 1 in

each, responding to Doc. 49-1, 49-2, and 49-3, ¶ 1 in each.)  Under all of these circumstances, it is

clear that Georgia law applies in the interpretation of the rights and duties of the parties pursuant to

the "Buy Back Agreements" and the Personal Guarantees.

**I.      "Buy Back Agreements" Too Indefinite to be Enforceable, so Guarantees of**
**Them Not Enforceable**

The alleged "Buy Back Agreements" are not sufficient on their face to show that BRG, or

anyone other than Paul W. Flesh was to be the Buyer of the real property.  In fact, the contracts all

were executed only by Paul W. Flesh as a "Managing Member" of an unspecified entity.  A copy of

the contract claimed by Plaintiffs, JONATHAN NOBLE and ARLENE NOBLE, to be their alleged

"Buy Back Agrement" is attached to these Defendants' First Requests for Admissions to Plaintiffs,

JONATHAN NOBLE and ARLENE NOBLE, as Exhibit "A."(Doc. 49-7, ¶ 1, in response to Doc.

49-1, ¶1.) A copy of the contract claimed by Plaintiffs, SHMUEL GOSHEN and SHULAMIT GOSHEN, to be their alleged "Buy Back Agreement" is attached to these Defendants' First Requests for Admissions to Plaintiffs, SHMUEL GOSHEN and SHULAMIT GOSHEN as Exhibit "A." (Doc. 49-9, ¶ 1, in response to Doc. 49-2, ¶ 1.) A copy of the contract claimed by Plaintiffs, SAMUEL LI and LILLIAN HAN, to be their alleged "Buy Back Agreement" is attached to these Defendants' First Requests for Admissions to Plaintiffs, SAMUEL LI and LILLIAN HAN as Exhibit "A." (Doc. 49-8, ¶ 1, in response to Doc. 49-3, ¶ 1.) All Plaintiffs admit that such copies of the "Buy Back Agreements" are the ones on which they are relying as the underlying agreements for the Personal Guarantees. (Doc. 49-7, ¶ 1, Doc. 49-8, ¶ 1, Doc. 49-9, ¶ 1.)

Pursuant to applicable Georgia law, the so-called "Buy Back Agreement" upon which the alleged Guarantee is based is so indefinite on its face as to not constitute an enforceable contract, and therefore, the Plaintiffs have failed to state a cause of action or to have a legally enforceable guarantee based upon the indefiniteness of the underlying agreement. Section13-3-1, Georgia Code Annotated describes the essentials of a contract, as follows:

> To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the asset of the parties to the terms of the contract, and a subject matter upon which the contract can operate.

O.C.G.A. §13-3-1.

Although the statutory provision quoted immediately above provides the black letter law concerning any contract, the case law in Georgia has elaborated on the requirements for certainty in the terms of a contract for it to be enforceable. For example, it has been said that the requirement that the essential terms of a contract be certain extends not only to the subject matter and the purpose of the contract, but also to the identity of the parties. *Zürich American Ins. Co. v. General Car & Truck Leasing System Inc.*, 574 S.E. 2d 914, 915-916 (Ga. App. 2002) (unsigned motor

vehicle lease providing that lessor's motor vehicle liability coverage was primary was incorporated by reference in a vehicle pick-up form signed by corporate lessee's driver and was deemed <u>not</u> controlling, because there was no evidence lessee and lessor ever agreed that the signature of lessee's employee was "transferred" from the vehicle pick-up form to the main lease; no main lease agreement was signed, so no contract dealing with insurance primacy existed).  A party asserting the existence of a contract has the burden of proving its existence and terms. *Id.* at 916; *Jackson v. Easters*, 379 S.E. 2d 610 (Ga. App. 1989).

In the case of the so-called "Buy Back Agreements," the fact is that the seller of the real property to each of the Plaintiffs was BRG, yet <u>that company is not mentioned in any of the "Buy Back Agreements</u>."  In fact, somewhat strangely, Page 5 of each of the "Buy Back Agreements" states, toward the bottom of the page, "Attached:  PERSONAL GUARANTEE OF MEMBERS OF RESORT & SPA INVESTMENTS, LLC." As noted in the Affidavits of Whitney Harp and Brent Baldasare, the memberships in BRG and Resort & Spa Investments, LLC consisted of significantly different people and entities. (Doc. 50 and Doc. 51, ¶¶ 3-4.)

Avia Management, LLC, a Florida limited liability company, owned about a 28% interest in BRG.  (Doc. 50 and Doc. 51, ¶ 3.)  BRENT BALDASARE and WHITNEY HARP each owned a 25% membership interest in that company, along with Paul W. Flesh and Andrew Shumway. (Doc. 50 and Doc. 51, ¶ 3.) <u>BRG's other owners included the **wife** of Defendant, LEON SACCO, namely, Corina Sacco</u>, who held about a 20% interest directly in BRG, <u>a group of individual investors (9 or more)</u>, who held about a 22% interest in BRG, and Mountain Tracks Developing & Building, LLC, a Georgia limited liability company (hereinafter, "Mountain Tracks"), which held a 30% interest in BRG.  (Doc. 50 and Doc. 51, ¶ 4.)  BRENT BALDASARE, and WHITNEY HARP

understood at all times that Mountain Tracks was wholly owned and run by J.W. STEPHENS. (Doc. 50 and Doc. 51, ¶ 4.)

Clearly, if BRG was to "buy back" the lots purchased by the Plaintiffs, as they allege, then Corina Sacco and the 9 or more other unnamed investors in BRG (whose combined 20% and 22% interests of 42% were substantial) should have been signatories to the Personal Guarantees, yet they were <u>not</u>.

On the other hand, Resort & Spa Investments, LLC, a Florida limited liability company, had as its members and managers WHITNEY HARP, Andrew Shumway, Paul Flesh, J.W. STEPHENS, LEON SACCO, and BRENT BALDASARE, who are believed to have all owned equal interests of 20% each.  (Doc. 50 and Doc. 51, ¶ 4.)  Although the membership of this entity is more consistent with an implication that the "Buy Back Agreement" provision concerning the attachment of a Personal Guarantee of the members of Resort & Spa Investments, LLC applied to them, the fact is that the agreement could not be one for a "buy back" by that entity if the original seller of the involved real property was BRG.

Even stranger, as noted above, is the fact that no entity ever is identified in relation to the signature of Paul W. Flesh, who executed all of the alleged "Buy Back Agreements" with the indication that he signed as a "Managing Member."  The three "Buy Back Agreements" are very vague and ambiguous concerning who the actual parties involved as the Buyer and Seller were intended to be.  The identity of the Buyer simply is not mentioned.

## II.    GOSHEN's Personal Guarantee Too Indefinite to be Enforceable.

The Guarantee allegedly running in favor of GOSEHN and attached to the First Amended Complaint as an exhibit shows on its face that the party to be benefitted by the Guarantee (the Obligee) was not identified therein.  Accordingly, without more, the GOSHENS have failed to

state a cause of action and cannot prove that they were the intended Obligees under the Guarantee. The mere existence of signatures of these Defendants on the said Guarantee, which does not identify the Obligee, does not create a legal obligation of these Defendants to the GOSHENS, as a matter of law, because the agreement suffers from incurable indefiniteness on its face. O.C.G.A. §13-3-1; *Zurich American Ins. Co., supra.* Under these facts, it is totally speculative, based upon the face of the GOSHENS' Personal Guarantee document, as to whether or not it even applies to them at all.

### III    Absence of ARLENE NOBLE's Name Makes NOBLES' Alleged Guarantee to be Too Indefinite to be Enforceable.

The same principles apply to the absence of ARLENE NOBLE's name from the space where the name of the Obligee(s) under the Personal Guarantee as in the case of the "Buy Back Agreements" and the GOSHENS' Guarantee. *Id.* The only factual difference is that the name of JONATHAN NOBLE appears on the document. Nevertheless, the absence of ARLENE NOBLE's name from the document on its face would mean that she was not an intended Obligee of the Guarantee form, as a matter of common sense.

### IV.    Plaintiffs' Failure to Comply With O.C.G.A. §13-1-11(a)(3) Bars Their Claims for Attorneys' Fees

O.C.G.A. §13-1-11 (2010) states, in relevant part, the following:

> (a) Obligations to pay attorneys' fees upon any note or other evidence of indebtedness, in addition to the rate of interest specified therein, shall be valid and enforceable and collectible as part of such debt if such note or other evidence of indebtedness is collected by or through an attorney after maturity, subject to the following provisions:
>
>                * * *
>
> (3) The holder of the note or other evidence of indebtedness or his or her attorney at law shall, after maturity of the obligation, notify in writing the maker, endorser, or party sought to be held on said obligation that the

provisions relative to payment of attorney's fees in addition to the principal and interest shall be enforced and that such maker, endorser, or party sought to be held on said obligation has ten days from the receipt of such notice to pay the principal and interest without the attorney's fees.  If the maker, endorser, or party sought to be held on any such obligation shall pay the principal and interest in full before the expiration of such time, then the obligation to pay the attorney's fees shall be void and no court shall enforce the agreement.  The refusal of a debtor to accept delivery of the notice specified in this paragraph shall be the equivalent of such notice.

O.C.G.A. §13-1-11 (2010).

All Plaintiffs admitted that they did not provide a written notice to the movants that the provisions of the Personal Guarantee relative to the payment of attorney's fees, in addition to the principal and interest allegedly owed would be enforced, and that movants had ten days from the receipt of such notice to pay the principal and interest without the attorney's fees. (Doc. 49-7, 49-8, 49-9, ¶ 8, in response to Doc. 49-1, 49-2, 49-3.)

The Plaintiffs have pled entitlement to attorney's fees in their First Amended Complaint. (Doc. 40, "WHEREFORE" ¶ of Counts I, II, and III.)  The Guarantees are considered as "evidence of indebtedness" under Georgia law; the Georgia Supreme Court, in fact, has held that a Guarantee contract is an "evidence of indebtedness" within the meaning of the statute which requires a holder of a note or "other evidence of indebtedness" to notify the party sought to be held liable that the provisions relative to payment of attorney's fees will be enforced unless principal and interest are paid within ten days. *Broun v. Bank of Early*, 253 S.E.2d 755, 756, n 2 (Ga. 1979) (construing an earlier version of O.C.G.A. §13-1-11 (2010), namely, Code § 20-506(c)).

In applying the definition that an "evidence of indebtedness" is "…a writing which acknowledges a debt or obligation and which is executed by the party obligated thereby," the Georgia Supreme Court even has ruled that a lease is an "evidence of indebtedness" for which a

notice of intent to seek a recovery of attorney's fees and providing a 10-day payoff deadline of other parts of the claimed indebtedness pursuant to O.C.G.A. §13-1-11 is required. *Radioshack Corporation v. Cascade Crossing II, LLC*, 653 S.E.2d 680, 684 (citing *Broun*). Accordingly, it is clear that the Personal Guarantees in this action, assuming, *arguendo*, that they otherwise are binding, constitute an "evidence of indebtedness" that entitled the Defendants, WHITNEY HARP and BRENT BALDASARE, to the notice required by O.C.G.A. §13-1-11 (2010) before fees were pursued in this action by the Plaintiffs.  Therefore, the movants are entitled to judgment against the Plaintiffs eliminating their claims for attorney's fees from this action, because such notice is a "mandatory condition precedent" to a claim of attorney's fees under an "evidence of indebtedness" in Georgia.  *Core LaVista, LLC v. Cumming*, 709 S.E..2d 336, 342-343 (Ga. App. 2011).

**V.      No Guarantee Identifying Obligee Executed By These Defendants, No Dealings By These Defendants With Any of the Plaintiffs, So No Meeting of the Minds to Create a Guarantee When Someone Inserted Names of Obligees and Delivered Guarantees to Plaintiffs Without Authority**

None of the Guarantee agreements attached to the First Amended Complaint as exhibits were completed at the time they were signed by WHITNEY HARP and BRENT BALDASARE such that they identified the Obligees, and these Defendants never gave their permission for the names of the Plaintiffs to be inserted in the Guarantee agreements, as apparently was done in the case of the Plaintiffs, NOBLE, HAN and LI.  (Doc. 50 and Doc. 51 ¶ 20.) These Defendants <u>never</u> dealt with the Plaintiffs in connection with the execution and delivery of the Personal Guarantees, and they <u>never</u> provided any communication to the Plaintiffs that the Plaintiffs could deal with anyone in these Defendants' stead, or as these Defendants' agent, with respect to the delivery of the Personal Guarantees. (Doc. 50 and, Doc. 51 ¶ 20.)

The Plaintiffs all admit that they never communicated directly with WHITNEY HARP or BRENT BALDASARE prior to the Plaintiffs' purchase of real property from BRG.  (Doc. 49-7, ¶ 5, in response to Doc. 49-1, ¶ 5; Doc. 49-8, ¶ 4, in response to Doc. 49-2, ¶ 4; Doc. 49-9, ¶4, in response to Doc. 49-3, ¶4.) The Plaintiffs' reliance upon a third party, apparently Paul Flesh, with respect to any obligation of these Defendants to the Plaintiffs, without the Plaintiffs' confirming the alleged Guarantee obligations of these Defendants was facially unreasonable.

WHITNEY HARP and BRENT BALDASARE never authorized Paul Flesh or anyone else to offer the subject Guarantees to the Plaintiffs, but had authorized the use of the Guarantees only in regard to a proposed transaction with a particular group of investors who were not the Plaintiffs. (Doc. 50, ¶¶ 9-13; Doc. 51, ¶¶ 9-15.)  Neither Paul Flesh nor anyone else had these Defendants' authority to fill in the names of NOBLE, HAN or LI as the Obligees on the subject Guarantee forms.  (Doc. 50, ¶20; Doc. 51, ¶20.)  Accordingly, these Defendants never offered the Personal Guarantees to the Plaintiffs, never entered into the Personal Guarantees with the Plaintiffs, and are not bound under same.

The Georgia Statute of Frauds provides that a promise to answer for the debt, default, or miscarriage of another must be in writing and signed by the party to be charged therewith or some person lawfully authorized by him. O.C.G.A. §13-5-30.  It also requires that contracts for the purchase of real property comply with the same requirements.  *Id*.

As recognized in Georgia, the "equal dignity rule" would have required that the Plaintiffs receive from Paul W. Flesh written confirmation of his authority to act on behalf of WHITNEY HARP and BRENT BALDASARE if he had been executing the Personal Guarantees to the Plaintiffs as the agent of these Defendants.  *Turnipseed v, Jaje*, 477 S.E.2d 101, 103 (Ga. 1996 ) (purchaser of real estate was charged with notice that vendor's authority to execute real estate sales

contract for co-vendor was required by law to be in writing under the Statute of Frauds, and therefore, was negligent in failing to determine whether vendor had requisite written authority to bind co-vendors); *Lee v. Green Land Company, Inc.*, 538 S.E.2d 189, 192 (Ga. App. 2000) (where a party seeking to enforce a real estate contract signed by an agent for the seller, the buyer was not allowed to advance to trial and had summary judgment entered against him where the authority of the agent to execute the real estate sales contract, which was required by the Georgia Statute of Frauds to be in a signed writing, also needed to be confirmed in a signed writing, but was not).

The movants contend that the same principle should be applied with respect to the <u>delivery</u> of the Personal Guarantee agreements where the Plaintiffs evidently never obtained any written confirmation of Paul W. Flesh's authority to deliver the Personal Guarantee agreements to the Plaintiffs. This is particularly true where the Plaintiffs readily admit that they never had any direct communications with the Defendants, WHITNEY HARP and BRENT BALDASARE, and they had no verification that the signatures on the Personal Guarantees were genuine, or that Paul W. Flesh actually had authority to deliver the documents.

It must be remembered that these Defendants have provided proof, in the Affidavit of J. W. Stephenson, that his signature on the Personal Guarantee was forged by someone, and that WHITNEY HARP and BRENT BALDASARE would not have executed the Personal Guarantees but for their belief that J. W. Stephenson and all other proposed Guarantors had executed the guarantee documents before them. Furthermore, these Defendants have provided their Affidavit testimony that the blanks for the names of the Obligee(s) were left empty in anticipation of the documents being used for a group of investors to purchase at least 17 lots, not the 4 lots purchased by the Plaintiffs.  In a transaction of this magnitude, it should be incumbent upon the purchasers seeking to resell the purchased property for a certain price that is personally guaranteed by

individuals to confirm, in writing, the authority of the person who delivers signed Personal

Guarantees from other individuals whom they did not see execute the documents.

VII.   **GSS INTERNATIONAL MNG, LLC is Not Named in Any of the Contractual Documents, it is Not Alleged to be Assignee of the GOSHENS, and it Has no Right to be Participating in This Action**

GSS INTERNATIONAL MNG, LLC is a named Plaintiff in this action in some connection with

the GOSHENS, yet it is not referenced in any of the contractual documentation upon which the

GOSHENS rely, there are no allegations in the First Amended Complaint indicating that it has any

interest whatsoever in the transactions that are the subject of this case.  Therefore, any claim by it

should be dismissed, as a matter of law, because it appears to be nothing more than an interloper in

this action.

### Conclusion

For the foregoing reasons, the Defendants, WHITNEY HARP and BRENT BALDASARE

respectfully request that this honorable Court grant them full or partial summary judgment in

accordance with the foregoing.

### CERTIFICATE OF SERVICE

I certify that on December 3, 2012, I electronically filed the foregoing with the Clerk of the Court by using the *CM/ECF* system for the Service List below and by US Mail to JW STEPHENS, Pro Se, P.O. Box 714, Mineral Bluff, Georgia 30559.

TERRY & FRAZIER, P.A.


BY:_____s/ T. Scott Frazier_____
T. SCOTT FRAZIER, ESQUIRE
Florida Bar No.: 311601
Terry and Frazier, P.A.
125 East Jefferson Street

Orlando, Florida 32801
Tele: (407) 843-1956
Fax: (407) 843-4210
Email: terryandfrazier@bellsouth.net
Attorney for Defendants Baldasare and Harp

### SERVICE LIST

BRADFORD A. PATRICK, ESQUIRE
3001 North Rocky Point Drive East
Suite 200
Tampa, FL 33607
E-mail: bap@baplegal.com
Attorney for Plaintiffs


JENNIFER A. ENGLERT, ESQUIRE
Englert, Leite & Martin, PL
3564 Avalon Park Blvd E. Ste. 1 # 266
Orlando, Florida 32828
E-mail: jenglert@elmattorneys.com
Attorney for Defendant Leon Sacco


C:\Users\Susan\Documents\SUSAN\Clients\Baldasare-Harp\MSJ.doc